AUGUST TERM, 1888.    629

The State ex rel. Neeves and others vs. Wood County and another.

THE STATE EX REL. NEEVES and others vs. WOOD COUNTY and another.

*October 18 — November 8, 1888.*

*Bridges: Counties:* Mandamus: *Rebuilding bridge over navigable river: Authority to levy tax therefor.*

1. Where a bridge belonging to a county has been destroyed, and the county is precluded from building a new bridge in a different location until the levy of a tax or the issue of bonds to pay for the same has been authorized by a majority of the electors of the county, a supposed discretion in the county board either to build a new bridge in the different location or to rebuild the bridge on the old site will not be a defense to a proceeding by *mandamus* to compel the rebuilding of the old bridge.

2. Although a county was bound to keep in repair a bridge over a navigable river, which it had purchased under authority given by law, yet, such bridge having been destroyed, the county board cannot be compelled by *mandamus* to rebuild such bridge, unless it has at its command the means for paying the expense thereof, or authority to procure such means.

3. Sec. 1308, R. S., authorizing the levy of a county road tax, to be expended "in making culverts, grading, graveling, ditching, or otherwise improving" the highways, does not authorize the levy of such tax for the purpose of rebuilding a bridge over a navigable river at extraordinary expense.

4. Secs. 1320, 1321, R. S., as amended by ch. 345, Laws of 1885, and ch. 285, Laws of 1887, are *held* to be applicable to the rebuilding of a bridge over a navigable river, notwithstanding such bridge was purchased by the county prior to the original enactment of those sections as ch. 229, Laws of 1874. *State ex rel. Rochester v. Racine Co.* 70 Wis. 543, distinguished.

The State ex rel. Neeves and others vs. Wood County and another.

MANDAMUS to *Wood County* and to the *Board of Supervisors of Wood County.* The following statement of the case was prepared by Mr. Justice CASSODAY:

It appears from the relation, in effect, that the cities of Grand Rapids and Centralia were respectively incorporated many years ago, and are situated upon opposite sides of the Wisconsin river,— a navigable stream,— in Wood county; that the relators are residents, citizens, tax-payers, and free-holders of one or the other of said cities; that one of said cities contains a population of 1,700, with property therein assessed at $200,000, and the other a population of 1,000, with property therein assessed at $135,000; that, in 1867, the Wood County Bridge Company, a corporation created and organized under ch. 178, P. & L. Laws of 1865, con-structed a toll-bridge across said river, between said cities, at a point described, and continued to run and operate the same as a toll-bridge until it was purchased by the county in 1873; that by sec. 6 of said chapter it was provided, in effect, that said county should, at any time after five years from September 1, 1867, have the right to purchase the same by paying to said company the value at which the same should then be appraised in the manner provided for . in said act; that in March, 1873, the county, pursuant to such provisions, exercised its right to purchase, and did purchase, said bridge from said company, and paid it there-for, including all the appurtenances, toll-house, and the soil or landing places upon which the ends of the bridge rested, and the right of way thereto, the sum of $10,500,— that being the value as fixed by such appraisers; and that said bridge then became, and ever since has been and still remains, the property of the county, and is one of the principal high-ways of the county; that it then became, and ever since that time has remained, a free bridge, which it has been and is the county's duty to keep up and maintain in a safe condi-tion for public travel as a free bridge; that the county did

so keep up and maintain said bridge in such safe condition until some time in 1875, when, after it became dilapidated and unsafe for public travel, it refused to further repair the same, but was compelled to do so by the court (41 Wis. 28); that thereupon the county repaired the bridge, and placed it in safe condition for public travel; that in 1877 the county rebuilt said bridge anew, of wood, at a cost of about $8,000; and that it purchased the approaches or right of way leading from the adjacent streets to the ends of the bridge, a distance of about eighty feet, to be used as a public highway in connection with the bridge.

It further appears from the relation that on April 11, 1888, the two westerly spans of said bridge and one pier were taken out and carried away and destroyed by an ice jam and high water, leaving only one pier, one span, and the two abutments remaining; that the total length of said bridge, exclusive of the approaches, was 525 feet, and the length of the remaining span about 175 feet; that said bridge is the only wagon bridge across that river between said cities, or within said county, or for a distance of twenty-five miles either way from said cities, and that there are no ferries within that distance, nor any fordable point even at a low stage of water; that the county is the only corporation or body authorized to bridge said river in said county; that said bridge is located at the foot of Grand rapids, in said river, which is subject to frequent floods and freshets; that transportation across the same between said cities by means of ferry or boats, during the greater portion of the year, is and will be extremely unsafe, hazardous, and dangerous to life and property; that the bridge is necessary for the business intercourse between the people of the respective cities, and to enable the people of each to reach the railroad depots on the respective sides of the river, and to carry the mail between said cities and to and from said

depots and the county buildings, offices, and courts in said city of Grand Rapids; that there are 18,000 inhabitants in the county, of which only 3,000 are east of the river; that the cost of rebuilding said bridge with new stone piers and abutments and iron superstructure will not exceed $25,000, and that the cost of repairing the same, by using what is not destroyed, will not exceed $7,000; that the total assessed valuation of all taxable property in the county is $2,197,600; and that the total indebtedness of the county does not exceed $30,000.

The relation further states that on April 24, 1888, a meeting of the board of supervisors of said county was, at the request of a majority of the board, duly called for May 3, 1888, for the purpose of taking the necessary steps for rebuilding and repairing said bridge; that all the members of the board met accordingly, and organized; that thereupon said board, by resolution in writing passed and adopted by a vote of the majority thereof, resolved to forever close said bridge as a public highway and for public travel; that the remains of said bridge be donated and given to such corporation or corporations as might rebuild the same, together with all the rights, privileges, and franchises thereunto appertaining and belonging to the county, and that all resolutions, ordinances, or orders conflicting therewith, or authorizing any expenditure of money in or about such bridge, were thereby, in form, repealed and rescinded; that the board, by a majority vote, thereupon refused to take any steps for the rebuilding of said bridge; that no petition was presented to said board signed by thirty resident freeholders of the county, nor by fifteen freeholders from each of said cities, asking the closing or discontinuance of said bridge as a public highway or otherwise.

Upon such relation an alternative writ of *mandamus* was issued to the county and to the board of supervisors, by

which they were required forthwith to repair, construct, and place said bridge across said river in a safe condition for travel, or show cause to the contrary thereof.

It appears from a return to the writ, among other things, that the portions of the bridge that remain cannot be used in building a new bridge, but must be removed if one is built in that place.   The return denies that said bridge was ever a public highway, or that the public necessities require the rebuilding of said bridge or any bridge between said cities, or that the county is the only corporation authorized to bridge the river within the county, or that there is any duty devolving upon the county to bridge the river; and alleges that said cities are authorized to bridge the river; that, if a new bridge were to be built across said river between said cities, it ought not to be built at the place designated in said writ, but at a point higher up the river, upon section 8, township 22 N., of range 6 E., where the river is free from ice gorges; that ice gorges are liable to form at the foot of the rapids where said bridge was built, and have frequently formed there, and have threatened and endangered said bridge in former years (when it was newer, stronger, and less damaged from repeated ice gorges) more seriously than at the time when it was swept away, April 11, 1888; that it is the belief of a majority of the board that no bridge built at that point can long withstand the ice gorges that form at the foot of said rapids; that the great majority of the people of the county have no interest in the maintenance of the bridge, and hence that the board refused to take any steps for rebuilding or repairing the bridge, and passed the resolution mentioned in the relation.

The return admits that no petition was presented to the said board, asking that said bridge be closed or discontinued, but insists upon the board having the right to so close or discontinue without such petition; and it alleges and claims that the board had the right and discretion to decide

whether any bridge across said river between said cities is needed by the people of the county or the public at large, and whether the convenience of such bridge is such as to warrant the expense; that they have the right and discretion to determine the locality where and the time when the same should be built; that the majority of the board have determined and are of the opinion that no bridge should be built there at the expense of the county,— especially at the point designated in said writ; and that the laws of the state give the board the right and discretion to select the point where they will build such bridge.

To such return to the alternative writ of *mandamus* the relators demurred on the ground that the said return does not state facts sufficient to constitute a cause why the writ prayed for should not issue or to constitute a defense to said action.

For the relators there was a brief by *Gardner & Gaynor*, attorneys, and *I. C. Sloan, Geo. A. Neeves*, and *Geo. L. Williams*, of counsel, and oral argument by *Geo. R. Gardner, Geo. L. Williams* and *I. C. Sloan*.

For the respondents there was a brief by *Silverthorn, Hurley, Ryan & Jones, J. W. Cochran*, and *Frank A. Cady*, and oral argument by *W. C. Silverthorn* and *T. C. Ryan*.

CASSODAY, J. The bridge in question was constructed by the Wood County Bridge Company under its charter, on section 17, in township 22 north, of range 6 east, in Wood county, some time prior to September 1, 1867. The charter authorized the county to purchase the same and its appurtenances, including toll-house, and the soil or landing places upon which the ends of the bridge should rest, and the right of way thereto, any time after September 1, 1872. Secs. 1, 6, ch. 178, P. & L. Laws of 1865. Accordingly, such purchase was made in March, 1873. The charter provided that the franchises granted to the company thereby should

continue until the county should make such purchase, when the bridge should become a free bridge. _ *bid.* The charter also provided that, until such purchase, no person or persons should have the right to build any toll or free bridge across the river within two miles of the bridge thereby authorized. Id. sec. 7. By an act of the legislature approved March 19, 1873, and published April 1, 1873, the county of *Wood* was, upon certain conditions specified, expressly authorized to erect and forever maintain a free bridge across the Wisconsin river upon section 8, in said township and range, from a point within the city of Grand Rapids and upon said section 8, at the "grand chute," to a corresponding point in said section 8 within the village of Centralia; which points were to be selected, and the exact location of the bridge fixed upon and determined, within said limits, by the board of supervisors of said county. Secs. 1, 2, ch. 298, Laws of 1873. The same act provides for levying a county bridge tax in not less than three successive years for paying for such bridge, or, if the board deem the same preferable, to issue bonds in lieu of such tax. Id. secs. 5, 6. But this last section provides, in effect, that before any such tax shall be levied or such bonds issued, in either case the question shall be submitted to the qualified electors of said county at an election to be held at the various election precincts in said county, upon notice specifying the time, place, and manner of holding such election, and the question of levying the tax or of issuing the bonds to be voted upon, and gives the different forms of ballots to be used, and declares that "the said tax shall or shall not be levied, and the said bonds shall or shall not be issued, in accordance with the vote thereon," as therein provided, "by a majority of the electors of said county." The same section further provides "that no tax shall be levied or bonds issued as aforesaid until said county shall have complied with the provisions

of section seven " of ch. 178, P. & L. Laws of 1865, " by purchase and possession of said Wood county bridge."

Under these two acts it is very obvious that the county was prohibited from building any such bridge on section 8 until after it had exercised its option and actually purchased the bridge constructed by the Wood County Bridge Company. But the act of 1873 goes still further, and in effect precludes the county from building any such bridge on section 8 until the levying of such tax or issuing of such bonds has been actually voted " by a majority of the electors of said county." True, the supervisors might take the preliminary steps prescribed, and submit the question of levying such tax or issuing such bonds to a vote of such electors; but that is the extent to which coercion could now go, if at all, and the result would be uncertain, and might turn out to be entirely futile.   Such being the authority, or rather want of authority, in the county board, in relation to building a new bridge on section 8, there would seem to be no force in the argument advanced against the awarding of a *mandamus*, if the relators are otherwise entitled thereto, by reason of a supposed discretion in the board either to build such new bridge on section 8 or to rebuild such bridge on section 17.

The question recurs whether, under the circumstances disclosed by this record, the law imposes upon the county board the imperative duty of rebuilding the bridge on the old site.   As observed, the charter provided that upon the purchase of the bridge by the county the same should become a free bridge.   By such purchase the county became the owner, with the exclusive right of control, subject to the public user of the same as a free bridge; and consequently it was held by this court that the county was bound to keep the bridge in repair.   *State ex rel. Neeves v. Wood Co.* 41 Wis. 28; *Bishop v. Centralia*, 49 Wis. 674.   Such duty was there held to be compellable by *mandamus*.

A public bridge for public travel, connecting parts of a public highway, is itself a part of a public highway. 2 Am. & Eng. Ency. Law, 541, and cases there cited. It has been held that a county, bound by statute to repair public bridges, is likewise bound to replace or rebuild them when substantially destroyed. *State ex rel. Roundtree v. Gibson Co.* 80 Ind. 478, 41 Am. Rep. 821. But it cannot be successfully maintained that a county board of supervisors may be compelled to replace or rebuild such bridge, unless they have at their command the means for paying the expenses thereof, or the authority for procuring such means. Our statutes provide that "the several county boards in their respective counties may adopt any main traveled highways, *or parts of such highways*, as county roads, and *shall thereafter* cause the same to be kept in good *repair*, so long as they remain under their control." Sec. 1308, R. S.; *Stilling v. Thorp*, 54 Wis. 529. But we do not think that section authorizes a county board to levy the tax therein mentioned for the purpose of rebuilding a bridge over a navigable river under the circumstances here presented. The portion of the section referred to reads: " Any such board may annually levy on the taxable property of the county a county road tax, not exceeding eight thousand dollars, which shall be expended under their direction in making *culverts, grading, graveling, ditching*, or otherwise improving such highways." By a familiar rule of construction the words, " or otherwise improving such highways," must be held to mean the improving of such highways by the making of culverts, grading, graveling, ditching, or other improvements of a similar character; and not the rebuilding of a bridge at extraordinary expense, as here.

There is another reason why that section should not apply to the levying of a tax for building a bridge over a navigable river like the Wisconsin. There is another section of the statutes which, within certain limitations,

expressly authorizes any county through which such navigable stream runs, to levy and collect such tax for the purpose of building a bridge across such navigable stream, or to issue their corporate bonds therefor. Sec. 1320, R. S., as amended by sec. 1, ch. 345, Laws of 1885, and ch. 285, Laws of 1887. But the statutes also provide, in effect, that no such tax shall be levied or bonds issued for that purpose until the question of levying such tax or issuing such bonds shall have been submitted to a vote of the electors of such county and adopted in the manner prescribed. Sec. 1321, R. S., as amended by sec. 2, ch. 345, Laws of 1885. There is no claim that any such submission was ever had or any such vote ever taken. We must hold these sections applicable to the bridge in question, notwithstanding it was acquired by the county prior to the enactment of ch. 229, Laws of 1874. The case is distinguishable from *State ex rel. Rochester v. Racine Co.* 70 Wis. 543. The facts in that case were peculiar. It is enough here to say that the several session laws prior to 1878, referred to in the opinion in that case, were all repealed by sec. 4978, R. S., except in so far as revised and re-enacted in the Revised Statutes. Neither the charter of Grand Rapids (ch. 247, P. & L. Laws of 1869) nor the charter of Centralia (ch. 275, Laws of 1874) authorizes those cities or either of them to bridge the Wisconsin; so that sec. 1319, R. S., as amended by ch. 187, Laws of 1885, if otherwise applicable, does not apply. The Wisconsin, at the point in question, is a navigable river, and hence to bridge the same required statutory authority. Sec. 1598, R. S. As observed, the authority to purchase the bridge gave the county the right to maintain the same. But that did not give the county board unlimited authority to levy and collect taxes and expend money in the reconstruction of such bridge. On the contrary, such board is confined to the exercise of such authority as is given it by statute, either expressly or by necessary implication.

It appears from the return, and is conceded in the relation and by the demurrer, that the bridge in question was located at the foot of the rapids; that a bridge at that point is in danger annually of being swept away by ice gorges; that it was swept away in 1877, and again in April, 1888; that in 1877 the county rebuilt the bridge in part at a cost of $8,000 for the superstructure, that it would cost to rebuild the bridge, with new stone piers and abutments and iron superstructure, some $25,000; that the cost of repairing the bridge, using the portions not destroyed, would be at least $7,000, and probably much more; that, if the bridge should be thus repaired, it would probably last but a few years at most; that a suitable bridge can be built with much more safety and much more durability at a point further up the river on section 8.   Assuming, therefore, that the duty of maintaining a bridge at the point in question, or on section 8, rests upon the county, still the county board should not be compelled by *mandamus* to build the same, in the absence of the necessary means for paying the expenses thereof, or of the authority for procuring such means, which, as we have seen, does not now exist.

*By the Court.*— The demurrer to the return is overruled, and the relation is dismissed.