## FLEMING *v.* CITY OF ROME.

1. The municipal authorities of the City of Rome can lawfully have a street therein, the grade of which has been previously established on the city's initiative, brought to such grade without first having the damages which a landowner will suffer by reason thereof assessed and paid, or tendered, when none of his property is actually taken; such grading not being done in pursuance of the general plan or system contemplated by the eighth section of the act of 1907 amending the charter of such city.

2. The case of *Moore* v. *Atlanta,* 70 *Ga.* 611, reviewed and reaffirmed.

Argued December 16, 1907.—Decided March 26, 1908.<br/>Rehearing denied April 13, 1908.

Petition for injunction. Before Judge Wright. Floyd superior court. November 29, 1907.

*Denny & Harris, R. T. Fouché,* and *M. B. Eubanks,* for plaintiff. *J. W. & G. E. Maddox,* for defendants.

Fish, C. J. This writ of error brings under review the refusal to grant an interlocutory injunction, and presents for judicial answer the question, whether the municipal authorities of the City of Rome can lawfully have one of its streets brought to a grade previously established on the city's initiative, without first having the damages which a landowner will suffer by reason thereof assessed and paid, or tendered, when none of his property is actually taken. It has been many times held by this court that, prior to the ratification of the constitution of 1877, a municipality, proceeding regularly and within the scope of its authority, was not liable for consequential damages resulting to property owners from grading or otherwise improving its streets. *Hurt* v. *Atlanta,* 100 *Ga.* 277, and cit. That constitution declares: "Private property shall not be taken, or damaged, for public purposes, without just and adequate compensation being first paid." It was held in *City of Atlanta* v. *Green,* 67 *Ga.* 386, that, under this constitutional provision, municipal corporations were liable for consequential damages resulting to property owners by reason of the grading of streets; and there are many subsequent decisions of this court to the same effect. It was,

however, held in *Moore* v. *Atlanta,* 70 *Ga.* 611, that "The grading of streets should not be stopped, and extensive municipal improvements prevented by injunction, because of damage which would result to the owner of a lot bordering on the street." And, as was said in *Brown* v. *Atlanta Railway Co.,* 113 *Ga.* 476, "since the decision of this court in *Moore* v. *Atlanta* [supra], it has been the settled law of this State that the court would not by an interlocutory injunction interfere with a public improvement in which no part of the property of the citizen was actually taken." In *Athens Terminal Company* v. *Athens Foundry,* 129 *Ga.* 393, it was said: "The reasoning of the court [in *Moore's* case] was that if improvements in the highway were within the constitutional provision as to first paying damages, the power of a municipality to improve its streets would be destroyed, if before even repairing a street it must try with every property owner the question whether the improvements would help or hurt him; hence, ex necessitate rei, this provision of the constitution did not apply in the case of consequential damages to an abutting-land owner where the city graded its streets to make them more accessible or safer for passageway." In the present case, however, counsel for plaintiff in error have asked and obtained leave to review the decision rendered in *Moore* v. *Atlanta,* and, under the permission granted, have vigorously and forcibly questioned its soundness. But however much we might be impressed with the force of their arguments if the constitutional question presented were now one of first impression, we are not convinced that the decision rendered in that case, which has stood and been followed for about a quarter of a century as the settled law of this State, should, at this late day, be overruled, and the constitutional provision in question given the strict and rigorous construction for which counsel contend. In our opinion, the ruling made in that case should not now be disturbed, and we accordingly decline to overrule it.

Notwithstanding the well-settled rule, above cited, in this State, it can not be doubted that the General Assembly may, in giving to a municipality the right to grade, pave, and otherwise improve its streets, make an exception to the general rule on the subject, and require the municipality, as a condition precedent to the exercise of such right, to have assessed, and to pay, or tender, all damages which the owners of property may sustain by reason of grading,

paving, or otherwise improving the streets, though no property be actually taken in so doing. Before, however, it is held that such an exception has been established, the purpose of the legislature so to do should be clearly and unequivocally expressed or indicated. Is the right of the City of Rome to grade, pave, or otherwise improve its streets, burdened with the unusual exception above indicated? To show the correctness of our conclusion that it is not, it is necessary to set forth the provisions in its charter on the subject. The 57th section of the act approved September 25, 1883 (Acts 1882-3, p. 428), consolidating and amending the various acts incorporating that city, declares, that "the said mayor and council shall have full power and authority to open, lay out, to widen, straighten, or otherwise change streets, alleys, and squares in the said City of Rome. Whenever the said mayor and council shall exercise the power above delegated, they shall appoint two freeholders, and the owners of said lots fronting on the said streets or alleys shall, on five days' notice, appoint two freeholders, who shall proceed to assess the damages sustained or the advantages derived by the owner or owners of said lots, in consequence of the opening, widening, straightening, or otherwise changing said streets or alleys; and in case said assessors can not agree, they shall select a fifth freeholder; the said assessors to take an oath that they will faithfully discharge their duties, and each party to have the right to enter an appeal to the superior court of Floyd county within ten days of the rendition of said award; *provided,* if any property-owner shall fail, after notification, to appoint assessors by the time prescribed, then the two assessors appointed by the city shall proceed to make the assessment, and in the event they fail to agree they shall call in a third freeholder, who shall be sworn and act with them, and the finding of the majority shall stand as the award, unless appeal be entered as provided for in this section." "It is obvious that 'to open, lay out, widen,' or 'straighten' a street necessarily involves the taking of land not hitherto used for street purposes; and therefore, as to any or all of these matters, the damages contemplated by the act can easily and naturally be held to mean compensation to landowners for property thus taken." *Hurt* v. *Atlanta,* 100 *Ga.* 277. Were the words "to otherwise change" designed to apply where a street should be merely graded, without the taking of any of the adjacent land? Under the doctrine of ejusdem

generis, we are of the opinion that they were not. The phrase "or otherwise," when following an enumeration, should receive an ejusdem generis interpretation. 6 Words and Phrases Judicially Defined, 3105; 21 Am. & Eng. Enc. L. 1016. The rule of ejusdem generis is well stated in State *v.* Walsh, 43 Minn. 444, as follows: "It is a principle of statutory construction everywhere recognized and acted upon, not only with respect to penal statutes, but to those affecting only civil rights and duties, that where words particularly designating specific acts or things are followed by and associated with words of general import, comprehensively designating acts or things, the latter are generally to be regarded as comprehending only matters of the same kind or class as those particularly stated. They are to be deemed to have been used, not in the broad sense which they might bear if standing alone, but as related to the words of more definite and particular meaning with which they are associated." See 2 Lewis' Sutherland on Statutory Construction (2d ed.) §422 et seq. A case clearly in point is Re Brady Street, 99 Pa. St. 591. A statute of Pennsylvania provided for compensation to owners of land abutting on a street, for damages caused by a "change of the grade or lines" thereof, or in case the authorities "in any way alter or enlarge the same." The court, in a case for damages for widening an alley, say of the act: "It speaks of a change of the 'grade or lines' of any street; and, while the succeeding words, 'or in any way alter or enlarge the same,' might seem to apply to widening a street, yet, looking at the manifest object of the act [which was to compensate the owner whose property is not taken, but is injured by change of grade], we must read these general words in connection with such object. Tested by this familiar rule, it is manifest the general words referred to are qualified by the preceding special words, and that the act has no application where there is no change of grade." See 2 Lewis' Suth. Stat. Const. (2d ed.) §427 et seq. In construing a provision that a county board may levy a county-road tax on taxable property, "which shall be expended under their direction in making culverts, grading, graveling, ditching, or otherwise improving such highways," it was held, in State *v.* Wood County, 72 Wis. 637, that "by a familiar rule of construction, the words 'or *otherwise* improving such highways' must be held to mean the improving of such highways by the making of culverts, grading, graveling, ditching, or other improve-

ments of a similar character, and not the rebuilding of a bridge."
We are not unmindful that the maxim ejusdem generis is but a
rule of construction to aid in ascertaining the meaning of a statute
or other written instrument, and that the restriction of general
words to things ejusdem generis should not be carried to such ex-
cess as to deprive them of all meaning; in other words, if the enum-
eration of particular things is so complete and exhaustive as to
leave nothing which can be called ejusdem generis, then the general
words must be given a signification outside of the genus or class
indicated by the particular words, else the general words will be
meaningless.  It is clear, we think, that holding the words "to
otherwise change," in the statute under consideration, to be ejusdem
generis, and, therefore, to include only such changes as involve an
actual taking of property, will not render them meaningless, as the
preceding enumeration or particularization of the ways of "taking"
is not complete and exhaustive.  The deflection of a street by mu-
nicipal authorities necessarily involves a "taking" of adjacent land
(*Athens Terminal Co.* v. *Athens Foundry,* supra) ; and so, too, the
condemnation by a city of the right of a person to maintain a bridge
across one of its streets, and the removal of such structure, already
erected, and preventing the rebuilding of the same, is a "taking"
of property (*Trustees of Atlanta University* v. *Atlanta,* 93 *Ga.*
468) ; and there might, perhaps, be other instances given of the
alteration of streets by the "taking" of property, which are not
specifically designated in the enumeration of the methods of "tak-
ing" set out in the statute, but which would be covered by the
general words, "to otherwise change streets."  If the phrase "to
otherwise change streets" should not be interpreted as ejusdem
generis, but should be construed to embrace any and every change
made by the city in a street, by any means whatever, other than by
the methods specifically enumerated, then, before repairs to a street
could be lawfully made, though involving only slight changes there-
in, it would be necessary for the municipal authorities to proceed
in the manner prescribed in the charter, for the assessment of such
damages as would be sustained by the owner of a lot fronting on
the street, in consequence of the making of such repairs.  Such
owner, if dissatisfied with the assessment, would have the right of
appeal to the superior court, and might, therefore, indefinitely delay
repairs to the street, necessary to the safety of those using it.  Cer-

tainly the legislature never intended that the charter should have such a meaning. Whatever may be the procedure, under the act of 1883, for the ascertainment and payment of damages, caused by the alteration by the city of a permanent grade previously established, in behalf of a particular abutting-land owner, is immaterial in the case under consideration, for the reason that there was no evidence that the plaintiff in error, or those under whom he claims, ever had a permanent grade of the street in question established.

Counsel for plaintiff in error contend that by the terms of the act of 1907 (Acts 1907, p. 897), amending the charter of the City of Rome, the municipal authorities of the city "were required, as a condition precedent, to assess and pay all damages which would accrue to plaintiff in error's property before proceeding to change the grade in front of his property, and that this act was made especially to apply to the question of the change of the grade on this street and at this point." The caption of this act of 1907 is as follows: "An act to amend the several acts incorporating the City of Rome, Georgia, in Floyd county; to extend and define the corporate limits thereof; to create a board of public works and fix and define its powers; to provide for improving and maintaining the waterworks system; establishing a sewerage system, grading, paving, and macadamizing the streets, and for other purposes." A board of public works is created by section 2 of the act. The 6th section provides: "The mayor and council shall forthwith, after organization of the board, execute and deliver, or, if executed, deliver to said board, taking receipt therefor, signed by each member of the board, the bonds of the City of Rome recently voted and provided, to be issued for paving, grading, macadamizing or otherwise improving the streets of the city; for extending and improving the sewerage system; for extending, improving and adding to the waterworks system, the amounts being for the first item seventy-five thousand dollars ($75,000.00), for the second item twenty-five thousand dollars ($25,000.00), for the third item fifty thousand dollars ($50,000.00). Said board shall immediately proceed to offer said bonds for sale, and may sell same subject to approval of mayor and council in such amounts and at such times as they may deem best, and as may be in accordance with the laws and ordinances of said city under which said bonds are authorized to be issued; the proceeds from the

sale of said bonds to be deposited in such bank or banks to the credit of the board, and on such terms for safe-keeping and the payment of interest, as they may deem advisable and safe." According to the 7th section, "Whenever, in the opinion of the board, the money is forthcoming and provided to meet the expenses, they shall proceed to make contracts and employ and organize such a force of officers and agents as may be necessary to successfully and economically carry out the duties by this act required of them;" &c. The 8th section, upon which counsel for plaintiff in error relies, declares: "Said board shall cause a survey to be made of the streets, sewerage, and waterworks system, and shall have plans, specifications, and estimates of the cost of improvements contemplated, to be prepared and submitted to the mayor and council. The board shall designate the streets to be improved, locate the grades and widths thereof, the size and location of the sewers and the mains for the water system, which being done the mayor and council, first having approved such action, shall confirm the same and establish and fix the grades and settle all questions of damage to property owners on account thereof, and report the same to the board; thereupon the board shall pay such damages as may be assessed and so found from the funds in their hands provided for the improvement of the particular department for which such damages may be fixed or assessed. The location of the street grades and the sewer and water mains being thus determined and settled, said board shall proceed to the construction and improvement thereof as hereinafter provided." And in the 10th section it is declared: "The board shall not, from the funds coming into its hands from any and all sources, apply more than the sum of five thousand ($5,000.00) dollars for the survey, plat, estimates, and specifications, and superintendent and engineering work provided to be done, except upon a vote of at least four members of the board. The board shall, before beginning to pave or macadamize any street, fix and designate the location and position for telegraph, telephone, electric light and power and street railway poles or wires and gas pipes thereon." It is quite apparent from the caption of this act and the quotations we have made from the act itself, and, indeed, from the provisions of the act considered as a whole, that, besides extending the corporate limits, its main purpose was the inauguration of a scheme for the improvement and maintenance of the city's waterworks,

sewerage, and streets, according to a general plan or system, dependent for its accomplishment upon the bond issue referred to in the act.

Upon the hearing for interlocutory injunction, it was made to appear that the grade of Broad street, upon which the property of plaintiff in error fronts, in the "high-water district," was regularly fixed and established by the city, on its initiative, by an ordinance, prior to the passage of the act of 1907. It also appeared, from the amended answer, put in evidence and not controverted, that, in order that such portion of this street might be brought up to the established grade, it has been filled in, by the municipal authorities, for practically "its entire length throughout said high-water district, until the same is now practically in accordance with said established grade; that the western side of Broad street, immediately opposite the property described in the petition, for more than half the width of said street, was filled in some years ago, and is now some four feet higher than the sidewalk in front of said property; that the property owners along both sides of said Broad street, and in the same block in which said described property is located, have, voluntarily and at their own expense, raised their buildings to conform to said grade, except the owners of the property along a portion of the block between Third and Fourth avenues, on the eastern side of Broad street, including the property described in the petition; that at the present time all of Broad street as aforesaid has been raised practically to said grade, except the said described property and the Douglas property immediately south thereof, fronting on Broad street about 75 feet, thus leaving said property and said Douglas property, a frontage of about 150 feet, down in a hole, about four feet lower than the balance of said street and of the surrounding property." Taking these to be the facts, we are confident that the provisions of the 8th section of the act of 1907 are not applicable to the present case. We do not believe that the General Assembly, in passing that act, intended that before the municipal authorities of the City of Rome could lawfully have a. hole or break in one of its streets, such as is above described, filled in, there must be a compliance with the provisions of section 8 of the act, as to a survey, plans, specifications, estimate of the cost, and the assessment and payment of damages.

There is no merit in the further contention of counsel, that, under the act of 1894 (Civil Code, §4657 et seq.), the damages to the property of plaintiff in error should be assessed and paid or tendered before the work in question is done. As was said in *Georgia Railroad Co. v. Union Point,* 119 *Ga.* 814, this act of 1894 was merely intended, as its title indicates, to provide a uniform method of exercising the right of condemning, taking, or damaging private property for public purposes, where such right exists. If the assessment and payment of damages accruing to a landowner by reason of work done by the municipal authorities of the City of Rome on one of its streets, where there was no actual taking of his property, was not a condition precedent to the doing of such work, when the act of 1894 was adopted, as we have shown was the case, then the provisions of that statute, merely prescribing a uniform procedure for the exercise of the right of eminent domain, have no application to such consequential damages.

It follows from the foregoing that the court did not err in refusing to grant an interlocutory injunction.

*Judgment affirmed. All the Justices concur.*