A00A1315. GENERAL MOTORS ACCEPTANCE CORPORATION
v. JACKSON.
(542 SE2d 538)

ANDREWS, Presiding Judge.

General Motors Acceptance Corporation (GMAC)[1] appeals from the trial court's grant of summary judgment to T. Jerry Jackson, Commissioner of the Department of Revenue, in GMAC's appeal to the superior court of the Department's denial of its claim for a refund of sales and use taxes under OCGA § 48-8-45 (c).

In reviewing the Department's administrative decision, the superior court determines whether there was any evidence to support the agency's decision. *Sawyer v. Reheis*, 213 Ga. App. 727, 728-729 (1) (445 SE2d 837) (1994). Upon our review of the superior court's actions, the evidence is construed in favor of the agency's decision. *Ga. Power Co. v. Ga. Public Svc. Comm.*, 196 Ga. App. 572, 580 (5) (396 SE2d 562) (1990). Both the superior court and this Court review conclusions of law de novo. OCGA § 50-13-19 (h); *Municipal Elec. Auth. &c. v. Ga. Public Svc. Comm.*, 241 Ga. App. 237, 239 (1) (525 SE2d 399) (1999).

So viewed, the record shows that GMAC finances both General Motors dealers' wholesale floor plans and retail purchases by consumers of automobiles from these dealers. The dealer acquires the cars from General Motors, and GMAC finances the acquisition by the dealer. Dealers are required to make monthly payments to GMAC of interest only. At the time the car is sold to a consumer, the dealer remits to GMAC the amount of the floor plan liability for the car.

On consumer purchases, GMAC and each dealer enter into the GMAC Retail Plan, a master contract which provides that GMAC may purchase contracts from the dealer at a discount rate. If GMAC approves the consumer's credit, the dealer would sign the Installment Contract's assignment provision, without recourse, so that GMAC would have no right to recover from the dealer if the consumer defaulted. The assignment clause provides: "Seller assigns its interest in this contract to General Motors Acceptance Corporation (GMAC) under the terms of the GMAC Retail Plan agreement."

Upon GMAC's approval of the customer's credit and the resulting assignment to GMAC, the contract would be entered into GMAC's records, and payment would be made by GMAC to the dealer consisting of the "amount financed" on the contract, including sales tax, plus either a flat fee or an amount representing the difference between the interest rate the dealer charged the consumer and GMAC's "buy rate" at which the contract was purchased. The buy

---

[1] A brief has also been filed on behalf of amici curiae Bank of America, N.A., Chrysler Financial Company, LLC, First Union National Bank, N.A., and SunTrust Bank, N.A.

rate is generally lower than the rate paid by the retail customer and is where money is made on the deal. A flat fee is paid to the dealer if the rates are the same. Neither the assignment clause nor the GMAC Retail Plan makes any reference to sales taxes and their treatment after assignment.

Over years of doing business, GMAC has established a rate of default of three percent for its retail installment financing business based on contracts assigned by dealers. In order to provide for that, GMAC sets aside a certain percent of the finance charge as an anticipated loss reserve. For retail consumers with riskier credit, a larger loss reserve is set up. GMAC maintains accounts for each dealer to which the loss reserves are credited. As losses occur, they are deducted from the assigning dealer's account by GMAC.

In the event of a default by a purchaser, GMAC attempts collection efforts by negotiating and eventually by repossessing and selling the vehicle. A defaulting purchaser is charged late charges in addition to other contract amounts. Even after a delinquent account has been charged off by GMAC, it is possible that additional amounts will be received from the purchaser through these efforts.

In August 1997, GMAC, for the first time, filed a claim for refund of sales taxes with the Department of Revenue. The claim sought a refund for the period from August 1, 1994 through October 31, 1996, for bad debts. GMAC computed the amount by multiplying the amount of its "uncollectible loan accounts" by a five percent tax rate.[2] This claim was denied by the Department, and the superior court granted the Department summary judgment on the appeal.

1. GMAC's first enumeration is that the trial court erred in concluding that it did not qualify as "any person" under OCGA § 48-8-45 (c).

That subsection provides that

*[a]ny person reporting* on the accrual basis of accounting shall be allowed a *deduction*[3] for bad debts under rules and regulations of the commissioner on the same basis that bad debts are allowed as a deduction on state income tax returns. In the case of an assignee of credit card debt purchased directly from a dealer without recourse, the assignee reporting on the accrual basis of accounting or a credit card bank which extends such credit to customers under a pri-

---

[2] As set out below, the statutory tax rate is four percent and there is nothing contained in the record below to explain this discrepancy.

[3] While GMAC below contended it was entitled to a refund, as reflected by the trial court's order, GMAC conceded during oral argument that, as provided by the statute, if it were entitled to anything, it would be a deduction, not a refund.

vate label credit card program shall be allowed a deduction for bad credit card debts under rules and regulations of the commissioner on the same basis that bad credit card debts are allowed as a deduction on state income tax returns.

(Emphasis supplied.)

The last sentence of this provision was added by Ga. L. 1998, p. 604, § 1.

This subsection, however, is not considered in a vacuum, but must be analyzed in the context of the entire Sales & Use Tax Act, including subsections (a) and (b) of OCGA § 48-8-45, and the Act's history, keeping in mind that courts, when interpreting statutes, look diligently for the intent of the General Assembly. OCGA § 1-3-1 (a); *Undercofler v. Capital Automobile Co.*, 111 Ga. App. 709, 716 (1) (143 SE2d 206) (1965).

The Sales & Use Tax Act was originally enacted to levy a privilege or license tax upon every person engaged in selling tangible personal property at retail, with the tax computed on gross sales of the retailer. *Hawes v. Phillips*, 122 Ga. App. 714, 716-717 (178 SE2d 759) (1970); *Williams v. Gen. Finance Corp.*, 98 Ga. App. 31, 34 (1) (104 SE2d 649) (1958).

In 1960, the Act was amended to impose the tax primarily upon the purchaser. As now contained in OCGA § 48-8-30 (b) (1), the amendment provided that

[e]very *purchaser* of tangible personal property at retail in this state *shall be liable for a tax on the purchase* at the rate of 4 percent of the sales price of the purchase. The *tax shall be paid by the purchaser to the retailer* making the sale. . . . The *retailer shall remit the tax to the commissioner* . . . [,] and, when received by the commissioner, the *tax shall be a credit against the tax imposed on the retailer*. Every person making a sale or sales of tangible personal property at retail in this state shall be a retailer and a dealer and shall be liable for a tax on the sale at the rate of 4 percent of the gross sale or gross sales, or the amount of taxes collected by him from his purchaser or purchasers, whichever is greater.

(Emphasis supplied.)

Thus, the tax imposed became a tax dual in nature, as both purchaser and retailer were liable for the tax and the tax was imposed upon each sale when the contract was executed. *Grantham Transfer Co. v. Hawes*, 225 Ga. 436, 442 (3) (d) (169 SE2d 290) (1969); *Undercofler v. Eastern Air Lines*, 221 Ga. 824, 834 (2) (147 SE2d 436) (1966); *Hawes*, supra, 122 Ga. App. at 717.

The retailer is required to register with the State and to report and remit the tax to the State on monthly returns. OCGA §§ 48-8-59 (a) (1); 48-8-30 (b) (1), (h); 48-8-32; 48-8-33; 48-8-49 (a).

OCGA § 48-8-45 (a) provides that the "person taxable" under the Act may report sales on either a cash or accrual basis of accounting. Once the basis is chosen, permission for a change must be obtained from the commissioner. OCGA § 48-8-45 (b) provides that persons reporting on a cash basis of accounting "shall include in each return all cash sales made during the period covered by the return and *all collections made in any period on credit sales of prior periods and shall pay the tax on the sales at the time of filing the return*." (Emphasis supplied.)

As reflected by the sample installment sales contracts contained in the record, all of those sales involved either trade-ins or cash down payments, or both. The total amount shown as a credit to the customers exceeded the sales tax shown due on these sample sales contracts. Therefore, it appears that the dealers would have remitted any sales tax owing to the Department the month of the sale.

It is also important, in considering whether GMAC is "any person" entitled to seek a deduction under the Act, to give great deference to the contemporaneous administrative construction given to the Act by the Department of Revenue and the legislature's acquiescence in that construction. *Undercofler v. Eastern Air Lines*, supra at 831 (2); *Ga. Public Svc. Comm. v. Sawnee Elec. &c. Corp.*, 242 Ga. App. 156, 159 (1) (529 SE2d 186) (2000). As reflected in Rule 560-12-1-.06, originally promulgated by the Department in 1965, and the affidavits of Commissioner Jackson, the Sales & Use Tax Act has been interpreted consistently as allowing a deduction only to a dealer and only under certain circumstances.[4]

That the legislature has been aware of and acquiesced in this interpretation is reflected by the 1998 amendment to OCGA § 48-8-45 (c), by which assignees of credit card debt are allowed a deduction for bad credit card debts. Whether and to what extent deductions to a taxation plan are allowed is a matter of legislative grace, and only where there is expression of a clear provision providing for it will a deduction be allowed. *New Colonial Ice Co. v. Helvering*, 292 U. S. 435, 440 (2) (54 SC 788, 78 LE 1348) (1934); *Fulton Bag &c. Mills v. Williams*, 212 Ga. 783, 786 (2) (95 SE2d 848) (1956). Therefore, having provided for a bad debt deduction to assignees of bad credit card debt, the legislature has impliedly denied it to any others. Any change would be a matter for consideration by the legislature, not

---

[4] That, under a previous commissioner, a refund was erroneously paid to SunTrust Bank is of no avail to GMAC. OCGA § 45-6-5; *Ben Hill County Bd. of Ed. v. Davis*, 270 Ga. 452, 453 (2) (510 SE2d 826) (1999).

the courts.

Further, where one seeks the benefit of an exemption from taxation, any such exemption must be strictly construed and will not be found unless the terms under which it is claimed " 'clearly and distinctly show that such was the intention of the legislature.' [Cits.]" *Cherokee Brick &c. Co. v. Redwine*, 209 Ga. 691, 693 (75 SE2d 550) (1953). See also *Douglas County v. Anneewakee, Inc.*, 179 Ga. App. 270, 272 (1) (346 SE2d 368) (1986).

Therefore, we concur with the Department and the superior court that GMAC is not a person entitled to seek a deduction for bad debts under the Sales & Use Tax Act.

2. The remaining enumerations of error are rendered moot in light of our holding in Division 1.

*Judgment affirmed. Ruffin and Ellington, JJ., concur.*

DECIDED NOVEMBER 15, 2000 —
RECONSIDERATION DENIED DECEMBER 4, 2000 — 

*King & Spalding, Nolan C. Leake, L. Wayne Pressgrove, Jr., Felton E. Parrish*, for appellant.

*Thurbert E. Baker, Attorney General, Daniel M. Formby, Deputy Attorney General, David A. Runnion, Warren R. Calvert, Senior Assistant Attorneys General*, for appellee.

*Parker, Hudson, Rainer & Dobbs, William J. Holley II, Charles W. Lyons*, amici curiae.