A07A0752, A07A0753. COASTAL MARSHLANDS PROTECTION COMMITTEE v. CENTER FOR A SUSTAINABLE COAST et al.; and vice versa.
A07A0897, A07A0934. POINT PETER, LLLP v. CENTER FOR A SUSTAINABLE COAST et al.; and vice versa.
(649 SE2d 619)

ANDREWS, Presiding Judge.

The primary issue presented in these appeals is whether the Coastal Marshlands Protection Act (CMPA) (OCGA § 12-5-280 et seq.), enacted in 1970 to protect coastal marshlands by regulation of activities and structures in the marshlands, may be construed to

regulate activities or structures in high land or upland[1] areas, including storm water runoff from those areas, that may adversely impact the marshlands.

These appeals arise from an application filed by a residential developer, Point Peter, LLLP, seeking a permit under the CMPA to construct marina and dock facilities on or over state-owned coastal marshlands and water bottoms[2] as part of the Cumberland Harbor residential development located on Point Peter peninsula in the city of St. Marys. Acting pursuant to the CMPA, the Coastal Marshlands Protection Committee (the Committee)[3] issued a permit authorizing Point Peter to construct the marina and dock facilities subject to various conditions. Following the Committee's action, the Center for a Sustainable Coast, the Georgia River Network, and the Satilla Riverwatch Alliance (the Challengers),[4] as "aggrieved or adversely affected" persons under OCGA § 12-5-283 (b) and (c), filed a petition to challenge the Committee's actions in a hearing before an administrative law judge (ALJ) in accordance with the Georgia Administrative Procedure Act (APA) (OCGA § 50-13-1 et seq.). The petition challenged the permit on various grounds including the contention that the Committee failed to properly apply the CMPA to protect the marshlands because it failed to regulate Point Peter's adjoining upland residential development, including pollutants carried into the marshlands by storm water runoff generated by the residential development. Point Peter intervened in the administrative proceedings pursuant to OCGA § 50-13-14 (1), a hearing was held, and the ALJ issued a final decision on February 20, 2006.[5] The ALJ affirmed portions of the permit that placed conditions on the marina and dock facilities, but reversed and remanded other portions of the permit for further consideration by the Committee. One basis for the remand was that the CMPA required the Committee to regulate any feature of Point Peter's upland development that may adversely alter the

---

[1] The term "upland" is used interchangeably in this opinion with the term "high land," as used in the CMPA.

[2] The State holds title to the beds of all tidewaters within the State up to the high water mark, except where a private party's title to a tidal waterbed is based on a valid Crown or state grant. *Black v. Floyd*, 280 Ga. 525 (630 SE2d 382) (2006); OCGA § 52-1-2.

[3] The Committee was created under OCGA § 12-5-283 (a) of the CMPA to consider permit applications (along with leases of state-owned marshlands and water bottoms) and is composed of the Commissioner of Natural Resources (who pursuant to OCGA § 12-2-1 (b) (1) supervises and executes the functions vested in the Georgia Department of Natural Resources) and four other persons selected by the Board of Natural Resources. The Board is the policy-making and governing body of the Department. OCGA § 12-2-24.

[4] The Challengers describe themselves as public interest environmental organizations.

[5] The decision of the ALJ constituted the final decision of the Board of Natural Resources and gave any party to the hearing, including the Committee, the right to judicial review under the Administrative Procedure Act. OCGA § 12-5-283 (b).

marshlands, including storm water runoff from the upland residential areas in the Cumberland Harbor development.

Within 30 days after the ALJ's decision, the Committee and Point Peter filed petitions seeking superior court judicial review of the ALJ's decision pursuant to OCGA §§ 12-5-283 (b) and 50-13-19 (b). On the 46th day after the ALJ's decision, the Challengers also filed a petition seeking superior court judicial review of the decision.[6] The ALJ's decision was subsequently affirmed by operation of law when the Fulton County Superior Court did not act on the petitions within the time limit set forth in OCGA § 12-2-1 (c). Pursuant to our grant of applications for discretionary appeals, the Committee (Case No. A07A0752) and Point Peter (Case No. A07A0897) appeal from the superior court's affirmance (by operation of law) of the ALJ's decision. In Case Nos. A07A0753 and A07A0934, the Challengers also appeal from the superior court's affirmance in identical cross-appeals to the appeals filed by the Committee and Point Peter.

1. We first address preliminary issues regarding our jurisdiction to consider the appeals.

Under OCGA § 50-13-20, only a final judgment of the superior court rendered pursuant to the APA may be reviewed on appeal by this Court. Generally, where a superior court remands for additional findings on any issue, this is not a final judgment subject to appellate review. *Ga. Public Svc. Comm. v. Southern Bell*, 254 Ga. 244, 247 (327 SE2d 726) (1985). Nevertheless, we find under the present circumstances that the ALJ's remand, which was made the superior court's remand by operation of law, does not preclude our exercise of jurisdiction. Here, the remand did more than merely return the case for consideration of additional issues and evidence to facilitate the superior court's final resolution of the case — a remand was ordered on the basis that the Committee erred as a matter of law by failing to construe the CMPA to require regulation of the upland residential development. On these facts, we find that the order was functionally and substantively an appealable final judgment under OCGA § 50-13-20. *Hughey v. Gwinnett County*, 278 Ga. 740-741 (609 SE2d 324) (2004); *Ga. Public Svc. Comm. v. Campaign for a Prosperous Ga.*, 229 Ga. App. 28, 29 (492 SE2d 916) (1997). Accordingly, we have jurisdiction to consider the appeals.

---

[6] The Committee and the Challengers filed their petitions in the Glynn County Superior Court, and Point Peter filed its petition in the Camden County Superior Court. By consent of the parties, the petitions were consolidated for a hearing, after which the Glynn County and Camden County Superior Courts, without addressing the merits, transferred the petitions to the Fulton County Superior Court. See OCGA § 50-13-19 (b); Ga. Const. of 1983, Art. VI, Sec. I, Par. VIII.

As to the cross-appeals brought by the Challengers in Case Nos. A07A0753 and A07A0934, the Committee and Point Peter contend that the failure of the Challengers to seek superior court judicial review of the ALJ's decision within 30 days after the decision requires that the cross-appeals be dismissed for lack of jurisdiction in this Court. Under OCGA § 12-5-283 (b) of the CMPA, judicial review of the ALJ's decision, which constituted the final decision of the Board of Natural Resources, was pursuant to the provisions of the APA. Because the Challengers failed to comply with APA provisions in OCGA § 50-13-19 (b) requiring that the petition for review be filed with the superior court within 30 days after the ALJ's decision, the superior court lacked jurisdiction to consider their untimely petition. *Dept. of Human Resources v. Lewis*, 217 Ga. App. 399-400 (457 SE2d 824) (1995). Nevertheless, the Committee and Point Peter filed timely petitions for review in the superior court, and then filed appeals from the superior court to this Court pursuant to our grant of discretionary appeals. OCGA §§ 50-13-20; 5-6-35 (g). As appellees in those appeals, the Challengers' appeals are properly before this Court as cross-appeals filed pursuant to OCGA § 5-6-38 (a). *Exec. Jet Sales v. Jet America*, 242 Ga. 307 (248 SE2d 676) (1978); *Centennial Ins. Co. v. Sandner*, 259 Ga. 317 (380 SE2d 704) (1989).

2. In Case Nos. A07A0752 and A07A0897, the Committee and Point Peter contend that the ALJ (as affirmed by the superior court) erred as a matter of law by construing the CMPA to require that the Committee consider whether activities in the upland residential development, including storm water runoff into the marshlands generated by the residential development, would alter the marshlands as regulated under OCGA § 12-5-286 (a). We conduct a de novo review with respect to claimed errors of law in the superior court's affirmance of the ALJ's decision. *Gen. Motors Acceptance Corp. v. Jackson*, 247 Ga. App. 141 (542 SE2d 538) (2000); *Gladowski v. Dept. of Family &c. Svcs.*, 281 Ga. App. 299 (635 SE2d 886) (2006); OCGA § 50-13-19 (h).

When the General Assembly enacted the CMPA, it expressly recognized the varied values and functions of Georgia's coastal marshlands that CMPA regulation protects.

> The General Assembly finds and declares that the coastal marshlands of Georgia comprise a vital natural resource system. It is recognized that the estuarine area of Georgia is the habitat of many species of marine life and wildlife and, without the food supplied by the marshlands, such marine life and wildlife cannot survive. The General Assembly further finds that intensive marine research has revealed that the estuarine marshlands of coastal Georgia are among

the richest providers of nutrients in the world. Such marshlands provide a nursery for commercially and recreationally important species of shellfish and other wildlife, provide a great buffer against flooding and erosion, and help control and disseminate pollutants. Also, it is found that the coastal marshlands provide a natural recreation resource which has become vitally linked to the economy of Georgia's coastal zone and to that of the entire state. The General Assembly further finds that this coastal marshlands resource system is costly, if not impossible, to reconstruct or rehabilitate once adversely affected by man related activities and is important to conserve for the present and future use and enjoyment of all citizens and visitors to this state. The General Assembly further finds that the coastal marshlands are a vital area of the state and are essential to maintain the health, safety, and welfare of all the citizens of the state. Therefore, the General Assembly declares that the management of the coastal marshlands has more than local significance, is of equal importance to all citizens of the state, is of state-wide concern, and consequently is properly a matter for regulation under the police power of the state.

OCGA § 12-5-281. In light of these findings, the General Assembly declared that "activities and structures in the coastal marshlands must be regulated to ensure that the values and functions of the coastal marshlands are not impaired. . . ." Id.

To regulate activities and structures in the marshlands, the CMPA provides:

No person shall remove, fill, dredge, drain, or otherwise alter any marshlands or construct or locate any structure on or over marshlands in this state within the estuarine area thereof without first obtaining a permit from the committee. . . . A permit may authorize the construction or maintenance of the project proposed in an application. After construction pursuant to a permit, a project may be maintained without a permit so long as it does not further alter the natural topography or vegetation at the project site.

OCGA § 12-5-286 (a).[7] The CMPA defines "marshlands" as "any marshland intertidal area, mud flat, tidal water bottom, or salt

---

[7] The CMPA regulations do not apply to the activities and structures excepted in OCGA § 12-5-295.

marsh in the State of Georgia within the estuarine area of the state" and defines "estuarine area" as "all tidally influenced waters, marshes, and marshlands lying within a tide-elevation range from 5.6 feet above mean tide level and below." OCGA § 12-5-282 (3), (7). Applications for a permit must be filed on Department of Natural Resources (DNR) forms and "shall include . . . [a] plan or drawing showing the applicant's proposal and the manner or method by which such proposal shall be accomplished . . . [and] shall identify the coastal marshlands affected . . . [and provide] [a] plat of the area in which the proposed work will take place." OCGA § 12-5-286 (b) (2), (3). In addition, the CMPA requires that a permit applicant show ownership of (or the legal right to use) the high land that borders on the marshlands affected by the proposed project. OCGA § 12-5-286 (b) (4). In passing on a permit application, the Committee must also consider the "public interest" by taking into account the following:

> (1) Whether or not unreasonably harmful obstruction to or alteration of the natural flow of navigational water within the affected area will arise as a result of the proposal;

> (2) Whether or not unreasonably harmful or increased erosion, shoaling of channels, or stagnant areas of water will be created; and

> (3) Whether or not the granting of a permit and the completion of the applicant's proposal will unreasonably interfere with the conservation of fish, shrimp, oysters, crabs, clams, or other marine life, wildlife, or other resources, including but not limited to water and oxygen supply.

OCGA § 12-5-286 (g).

The applicant must demonstrate to the Committee that the project's proposed alteration of the marshlands is not contrary to the public interest and that no feasible alternative sites exist. OCGA § 12-5-286 (h). "If the committee finds that the application is not contrary to the public interest and no feasible alternative sites exist . . . it shall issue to the applicant a permit." Id.[8] The Committee may place conditions on the permit requiring the applicant to amend the proposed project "to take whatever measures are necessary to protect the public interest." OCGA § 12-5-286 (h), (k). Permits shall

---

[8] Permits usually should not be granted if the project is not water related, not dependent on waterfront access, or could be satisfied by the use of a nonmarshland site. OCGA § 12-5-288 (a). The CMPA also lists certain activities and structures which are normally considered to be contrary to the public interest when located in the coastal marshlands. OCGA § 12-5-288 (b).

require that work on the proposed project be completed within five years (unless the Committee grants an extension as provided by the CMPA), and the Committee may, upon written notice to the holder, revoke any permit for noncompliance with or violation of its terms. OCGA § 12-5-286 (l). Moreover, after a permit has been issued and construction of the permitted project is completed, "the designated property" remains within the jurisdiction of the CMPA, and "[a]ll changes in permitted uses which increase impacts to any land subject to the provisions of this part must be assessed by the committee to determine if the proposed change is consistent with this part and the permit." OCGA § 12-5-286 (n). The CMPA requires the DNR to review issued permits every five years, "or when noncompliance with the purpose for which the permit was issued is evident," to determine if the use of the marshlands is consistent with the intent of the CMPA. Id. To ascertain whether CMPA requirements and issued permits are being faithfully complied with, the DNR is also required to "make reasonable inspections of the marshlands." OCGA § 12-5-289. Under OCGA § 12-5-286 (n), if a permit holder is found not to be in compliance with the CMPA, the Committee is required to take enforcement action under OCGA § 12-5-291. The enforcement methods set forth in OCGA § 12-5-291 may be used to enforce any requirements of the CMPA, any orders issued under the CMPA, or any rules and regulations promulgated under the CMPA, and apply when any person alters the marshlands without a permit or in violation of the terms and conditions of a permit, or violates the CMPA in any other manner. Id.

Pursuant to the CMPA requirements, Point Peter applied for a permit to construct two full service public marinas and three community day docks as part of its Cumberland Harbor residential development. The Cumberland Harbor development is located on a 1,014-acre site on a coastal peninsula comprised of high land bordered by state-owned tidal marshlands and water bottoms. Point Peter is presently developing about 650 high land acres of the site into a residential subdivision that will eventually include 900 to 1,200 homes. The description of the proposed marina and dock project accompanying the permit issued by the Committee shows facilities to be constructed on or over the marshlands and water bottoms (pilings, piers, floating docks, etc.) and adjoining high land facilities (marina offices, dry boat storage, parking, etc.) intended to service or augment the facilities located over the marshlands and water bottoms. After finding that the permit application was not contrary to the public interest and that no feasible alternative sites for the project existed, the Committee issued the permit subject to various conditions imposed pursuant to the CMPA or pursuant to agreement between the Committee and Point Peter. The permit also required pursuant to the

CMPA that, prior to commencing construction, Point Peter execute a fair market value lease of the affected state-owned marshlands or water bottoms for the purpose of constructing, operating, and maintaining the project. OCGA § 12-5-287. Under the CMPA, the lease was subject to the Committee's determination that Point Peter was eligible to execute the lease as the owner of the high land adjoined to and bordering the leased marshlands or water bottoms, and that the project included sufficient high land to properly service the marshlands or water bottoms to be leased for the marinas and docks. OCGA §§ 12-5-287; 12-5-282 (6).

The CMPA provisions show that Point Peter was required to apply to the Committee for a permit to construct the proposed marina and dock facilities on or over state-owned marshlands within the estuarine area. OCGA §§ 12-5-282 (3), (7); 12-5-286 (a). The application process required that Point Peter provide the Committee with the plans for the entire marina and dock project, including the component of the project to be constructed on or over the marshlands within the estuarine area, and the component of the project to be constructed on adjoining high land or upland areas intended to service or augment the marshlands component of the project. OCGA § 12-5-286; see OCGA § 12-5-287. Accordingly, when Point Peter applied for a permit to construct marina and dock facilities in the marshlands, the CMPA required the Committee to consider the application in the context of not only the marshlands component of the project, but also the high land component intended to serve or augment the marshlands component of the project. It follows that, when deciding whether to issue a permit and authorize the construction of the project proposed in the application (and on what conditions), the CMPA required the Committee to consider all of the project components when it considered whether the application for a permit was in the public interest and whether feasible alternative sites existed. OCGA § 12-5-286 (g), (h). This required the Committee to consider any aspects of the high land or upland component of the marina and dock project which pertained to the public interest and feasible alternative sites, including management of storm water runoff and erosion or sedimentation into the marshlands, and related issues of impervious surface coverage and buffers.[9]

---

[9] Impervious surface coverage in the upland component of the project, such as roofs or paved areas, reduces the amount of water absorbed into the ground and increases runoff and erosion of sediment into adjoining marshlands. Natural buffers in the upland component of the project act to reduce runoff and sediment deposits into the marshlands. Pursuant to OCGA § 12-5-285, the Department of Natural Resources (DNR) adopted an administrative rule, effective March 26, 2007, entitled "Regulation of Upland Component of a Project," which deals with these issues and is consistent with and implements the provisions of the CMPA addressed

Nothing in the CMPA, however, can be construed to require or authorize the Committee, as part of the permit application process, to consider or regulate any aspect of Point Peter's adjacent high land or upland residential development. Accordingly, the ALJ erred by construing the CMPA to require that the Committee consider any features of the upland residential development that may adversely affect the marshlands, including storm water runoff generated by the residential development. The ALJ remanded the permit to the Committee to consider the impact of the upland residential development on the marshlands on the theory that OCGA § 12-5-286 (a) required the Committee to consider whether the residential development "otherwise alter[ed] any marshlands." Under OCGA § 12-5-286 (a), "[n]o person shall remove, fill, dredge, drain, or *otherwise alter any marshlands* or construct or locate any structure on or over marshlands in this state within the estuarine area thereof without first obtaining a permit from the committee. . . ." (Emphasis supplied.) According to the ALJ, because pollutants carried by storm water runoff generated by the adjacent residential development could "otherwise alter" the marshlands, the CMPA required the Committee, as part of the permit application, to consider this impact when considering whether the application for a permit was in the "public interest" as set forth in OCGA § 12-5-286 (g).

Because the ALJ erroneously construed the CMPA, it was error to remand the permit application on this basis. Point Peter applied for a permit under the CMPA to construct marina and dock facilities on or over the state-owned marshlands. The CMPA cannot be reasonably construed to include the adjacent residential areas of the Cumberland Harbor development as part of the marina and dock construction project that the CMPA required Point Peter to describe in the permit application. Under the permitting provisions of OCGA § 12-5-286 and the provisions of OCGA § 12-5-287 (when lease requirements apply), the permitted project is limited to the marshlands component, comprised of the structures proposed to be constructed or located on or over the marshlands, and the upland component, comprised of adjoining upland areas intended to service or augment the marshlands component. Nothing in the CMPA can be construed to include the adjacent residential development as part of the permitted project, as suggested by the Challengers, merely because the permitted project is part of the overall Cumberland Harbor development and enhances the economic value of the residential development. The CMPA did not

in this opinion. Ga. Comp. R. & Regs. r. 391-2-3-.02. Moreover, because the DNR has expertise in these matters to which this Court defers, its administrative rule interpreting statutes which it is empowered to enforce carries a presumption of validity. OCGA § 12-5-284 (a) (1); *Ga. Dept. of Revenue v. Ga. Chemistry Council*, 270 Ga. App. 615, 616-617 (607 SE2d 207) (2004).

authorize the Committee to consider or regulate any aspect of upland development that was not part of the marshlands or upland components of the marina and dock project described in the permit application. In other words, when Point Peter applied to the Committee for a permit to construct the marina and dock project, the CMPA did not authorize the Committee as part of the permit application to also consider whether any aspect of the adjacent upland residential development, including storm water runoff, would "otherwise alter" the marshlands as regulated in OCGA § 12-5-286 (a).

Even though the ALJ's decision was rendered in the context of Point Peter's application for a permit to construct the marina and dock project, the logical implication of the ALJ's conclusion that storm water runoff from the residential development may "otherwise alter" the marshlands under OCGA § 12-5-286 (a) would be to vastly extend the jurisdiction of the CMPA. Under this construction, the CMPA could be employed to regulate and require permits for storm water runoff generated by upland developments adjacent to or even far removed from the coastal marshlands, whether or not the development had a dock or marina facility regulated by the CMPA. This would sweep under the authority of the CMPA any upland development, whether located on the coast or inland along rivers and their watersheds that flow to the coast, which generated polluted runoff that eventually reached and caused some alteration of the coastal marshlands. Not only would this construction of the CMPA create regulatory and enforcement burdens impossible for the DNR to administer, it cannot be squared with the provisions of OCGA § 12-5-286 (a) that define what kind of marshlands alteration requires a permit.

Under OCGA § 12-5-286 (a), in addition to requiring a permit for construction or location of any structure on or over the marshlands, "[n]o person shall remove, fill, dredge, drain, or otherwise alter any marshlands . . . within the estuarine area thereof without first obtaining a permit. . . ." Preceding the general words "otherwise alter" are four specific words — "remove, fill, dredge, drain." All four specific words refer to activities that alter the marshlands by direct physical alteration of marshlands topography or vegetation. Under the rule of statutory construction known as "ejusdem generis," when a generally described activity such as "otherwise alter" follows an enumeration of specifically described activities, the general activity will ordinarily be construed as referring to the same kind or class of activity as the preceding specific activities, unless something shows that a wider sense was intended. *Fleming v. City of Rome*, 130 Ga. 383, 385-387 (61 SE 5) (1908); *Hicks v. Florida State Bd. of Admin.*, 265 Ga. App. 545, 548 (594 SE2d 745) (2004). We find nothing showing that a wider

sense was intended and conclude that to "otherwise alter" the marshlands in the statute refers to activities of the same kind or class as "remove, fill, dredge, [or] drain." It follows that the CMPA can be construed to regulate storm water runoff into the marshlands under the "otherwise alter[s]" provision of OCGA § 12-5-286 (a) only to the extent that the runoff alters the marshlands in a direct physical manner akin to removing, filling, dredging, or draining the marshlands. Storm water runoff into the marshlands that does not alter the marshlands in this manner is not regulated under the "otherwise alter" provision, despite the fact that the runoff carries pollutants and may have an adverse impact on the marshlands. We need not consider the possibility of storm water runoff in some unusual or extreme form that may "otherwise alter" the marshlands under OCGA § 12-5-286 (a). Because there is no evidence that storm water runoff generated by the Cumberland Harbor upland residential development "otherwise alter[ed]" the marshlands as regulated by OCGA § 12-5-286 (a), the ALJ erred by construing the CMPA to regulate the runoff.[10] Considering as a whole the purpose of the CMPA and its provisions for regulation and enforcement, we find that a construction of the CMPA so broad that it could regulate all storm water runoff generated by upland development far exceeds the legislature's intended scope for the CMPA. *Ga. Emission Testing Co. v. Jackson*, 259 Ga. App. 250, 252-253 (576 SE2d 642) (2003); *Thornton v. Clarke County School Dist.*, 270 Ga. 633, 634-635 (514 SE2d 11) (1999); OCGA § 1-3-1 (a).

Although, as explained above, ordinary storm water runoff into the coastal marshlands is not regulated by the CMPA, this runoff is regulated under other laws. The federal Clean Water Act (CWA) (33 USC § 1251 et seq.) and the corresponding Georgia Water Quality Control Act (GWQCA) (OCGA § 12-5-20 et seq.) regulate the discharge of pollutants into the waters of the United States and Georgia. For purposes of the CWA and the GWQCA, the waters of the United States and Georgia include coastal marshlands as defined in the CMPA which form the border of or are in reasonable proximity to those waters. *United States v. Riverside Bayview Homes*, 474 U. S. 121, 124, 132-135 (106 SC 455, 88 LE2d 419) (1985); OCGA § 12-5-22 (13); see *Hughey*, 278 Ga. at 742. The regulated discharges include storm water runoff originating from a discernible "point source" (as defined by 33 USC § 1362 (14) and OCGA § 12-5-22 (8)) or from a

---

[10] At the time of the administrative hearing before the ALJ in November 2005, most of the infrastructure for the residential development, including roads, water and sewer lines, and a storm water management system, had already been completed, and most of the residential lots had been sold. None of this completed development required a permit under the CMPA.

"nonpoint source" such as runoff from farmlands, roads, or residential developments. *Sierra Club v. Meiburg*, 296 F3d 1021 (11th Cir. 2002); *Parker v. Scrap Metal Processors*, 386 F3d 993, 1009 (11th Cir. 2004). Erosion and sedimentation caused by storm water runoff into the marshlands are regulated by provisions in the Erosion and Sedimentation Act of 1975 (OCGA § 12-7-1 et seq.) which includes establishment of a 25-foot buffer along the banks of all state waters in OCGA § 12-7-6 (b) (15) (A). Moreover, local zoning ordinances provide additional regulation of storm water runoff into marshlands. The CMPA recognizes the existence of these other regulations by requiring that a permit application include a letter from the local governing authority that the proposed project does not violate any zoning law, a copy of any required water quality certification for the proposed project issued by the DNR, and a certification of adherence to soil and erosion control responsibilities if required for the proposed project. OCGA § 12-5-286 (b) (6), (10), (11). If another agency or governing authority denies a permit necessary for the project, the permit application under the CMPA shall stand denied. OCGA § 12-5-286 (q). These CMPA provisions further demonstrate that the legislature did not intend that the CMPA regulate ordinary storm water runoff into the marshlands generated by upland development that was not part of the upland component of a permitted project described and regulated under OCGA § 12-5-286.

3. In Case Nos. A07A0753 and A07A0934, the Challengers cross-appeal on various grounds contending that the ALJ (as affirmed by the superior court by operation of law) erroneously affirmed portions of the permit issued by the Committee. In reviewing the decision of the superior court affirming the ALJ, we affirm as to evidentiary issues if there was any evidence to support the ALJ's decision, and conduct a de novo review with respect to claimed errors of law. *Gen. Motors Acceptance Corp.*, 247 Ga. App. 141; *Gladowski*, 281 Ga. App. 299; *Walker v. Dept. of Transp.*, 279 Ga. App. 287, 290-291 (630 SE2d 878) (2006); *Fulton County v. Congregation of Anshei Chesed*, 275 Ga. 856, 859-860 (572 SE2d 530) (2002).

At a de novo evidentiary hearing,[11] the ALJ considered whether the Committee properly found that the permit was in the public interest under the provisions of OCGA § 12-5-286 (g), which (as set forth in Division 2, supra) required consideration of the following:

---

[11] The hearing was conducted under the Office of State Administrative Hearings pursuant to the APA. OCGA §§ 50-13-40 thru 50-13-44; Ga. Comp. R. & Regs. r. 616-1-2-.21 (3).

(1) Whether or not unreasonably harmful obstruction to or alteration of the natural flow of navigational water within the affected area will arise as a result of the proposal;

(2) Whether or not unreasonably harmful or increased erosion, shoaling of channels, or stagnant areas of water will be created; and

(3) Whether or not the granting of a permit and the completion of the applicant's proposal will unreasonably interfere with the conservation of fish, shrimp, oysters, crabs, clams, or other marine life, wildlife, or other resources, including but not limited to water and oxygen supply.

OCGA § 12-5-286 (g) (1), (2), (3). As to subsections (1) and (2), the ALJ agreed with the Committee that the proposed project would not result in unreasonably harmful obstruction to or alteration of the natural flow of navigational water, nor would it result in unreasonably harmful or increased erosion, shoaling of channels, or stagnant areas of water. As to subsection (3), the ALJ agreed in part and disagreed in part with the Committee. The ALJ found that the question of whether or not granting the permit and completing the proposed project would unreasonably interfere with the conservation of right whales, manatees, and sea turtles should be remanded to the Committee for further consideration. Accordingly, the ALJ reversed and remanded the permit to the Committee for further consideration of these issues. There is no appeal from this portion of the ALJ's decision by the Committee, Point Peter or the Challengers. The ALJ found with respect to all other animal life or resources listed in subsection (3), including marine life, wildlife, and specifically including gopher tortoises, indigo snakes, shorebirds, and wood storks, that the Committee properly concluded that granting the permit and completing the proposed project would not unreasonably interfere with the conservation of these resources. Except for the ALJ's erroneous reversal and remand to regulate aspects of the upland residential development (discussed in Division 2, supra), and the uncontested reversal and remand for further consideration of conservation measures applicable to right whales, manatees, and sea turtles, the ALJ otherwise affirmed the permit as issued by the Committee pursuant to the CMPA.

(a) The Challengers contend that the ALJ erred by finding under OCGA § 12-5-286 (g) (2) that the proposed project would not result in unreasonably harmful or increased erosion. The Challengers argue that erosion will result from the permitted dock structures and wakes created by increased boat traffic in the area, and from nearby private

docks built by owners of residential lots with frontage abutting adjacent marshlands. The evidence showed the permit was conditioned on imposition of slow speed/no wake zones around the proposed project to reduce erosion by boat traffic, and use of best management practices during construction to comply with provisions of the Erosion and Sedimentation Act of 1975. As to the private docks, these structures are not part of the permitted project and are not regulated under the CMPA to the extent they comply with the provisions of OCGA § 12-5-295 (7). The Challengers do not contend that there was no evidence to support the ALJ's finding, but argue that the evidence was unconvincing. Under the "any evidence" rule, we find no error and affirm the ALJ's findings made pursuant to OCGA § 12-5-286 (g) (2).

(b) The Challengers contend that the ALJ erred by finding under OCGA § 12-5-286 (g) (3) that granting the permit and completing the proposed project would not unreasonably interfere with the conservation of gopher tortoises, indigo snakes, shorebirds, and wood storks. Evidence showed that the permit issued by the Committee was conditioned on compliance with conservation measures for marine life and wildlife set forth in a "biological assessment" document prepared for the U. S. Army Corps of Engineers. In addition to applying for a permit under the CMPA, Point Peter was required under Section 10 of the Rivers and Harbors Act (33 USC § 403 et seq.) to apply to the Corps for a permit for the proposed project. The Corps was required to verify whether issuing the permit would jeopardize any endangered or threatened species protected by the Endangered Species Act (ESA) (16 USC § 1531 et seq.). *Sierra Club v. U. S. Army Corps of Engineers*, 295 F3d 1209, 1211-1212 (11th Cir. 2002). After determining through consultation with the U. S. Fish and Wildlife Service and the National Marine Fisheries Service that species listed in the ESA may be present in areas affected by the proposed project, a biological assessment (BA) document was prepared for the Corps pursuant to the ESA. Id. at 1212-1214. The BA at issue identified endangered or threatened species listed under the ESA and the Endangered Wildlife Act of 1973 (EWA) (OCGA § 27-3-130 et seq.) in the area of the project, potential impacts to the species, and conservation measures designed to minimize the impacts. Although the CMPA did not require the Committee to consider the BA issued pursuant to the ESA, the Committee was furnished with a draft version of the BA dated February 2005 as it considered the permit application. The permit issued by the Committee in March 2005 contained conditions requiring compliance with conservation measures set forth in the draft BA and any refinements to those measures in the final BA approved by the Corps. The Committee imposed a further condition providing that, if the final BA approved by the

Corps made any substantial changes to the conservation measures in the draft BA, the Committee would exercise its continuing jurisdiction over the project under OCGA § 12-5-286 (n) to ensure that the project remained conditioned on conservation measures consistent with the measures reviewed for the permit and the requirements of the CMPA. There is no evidence in the record of a final BA or changes to the draft BA.

We find no error in the ALJ's consideration of provisions in the draft BA to find pursuant to OCGA § 12-5-286 (g) (3) that the permit issued by the Committee was not contrary to the public interest. The BA set forth conservation measures and other evidence with respect to shorebirds and wood storks. As to indigo snakes, the BA found that despite numerous investigations, no indigo snakes were found, and due to marginally suitable habitat it was unlikely any were in the area. As to gopher tortoises, a threatened species under the EWA (Ga. Comp. R. & Regs. r. 391-4-10-.09 (3) (h)), the BA contains evidence of a gopher tortoise colony existing within the upland component of the proposed project, and the permit issued by the Committee contains a condition requiring that Point Peter work with state and federal officials to determine an appropriate management plan for the colony. The BA and other conditions of the permit provided a sufficient basis for the ALJ's finding that granting the permit and completing the proposed project would not unreasonably interfere with the conservation of gopher tortoises, indigo snakes, shorebirds, and wood storks. Again, the Challengers do not contend that there was no evidence to support the ALJ's finding, but argue that the evidence was insufficient. Under the "any evidence" rule, we find no error and affirm the ALJ's findings made pursuant to OCGA § 12-5-286 (g) (3).

(c) The Challengers contend that, when the ALJ reversed and remanded the permit for further consideration of conservation measures applicable to right whales, manatees, and sea turtles, the ALJ erred by finding that, on remand, the Committee "need not consider the approximate number of boats added to the area. . . ." Because the ALJ found that collisions with boats pose one of the most serious threats to these species, the Challengers argue that the ALJ was required to instruct the Committee to consider the number of boats added to the area by the permitted project. Although the ALJ did not require the Committee to consider on remand the number of boats the project may add to the area,[12] the ALJ found that certain conservation measures are essential to protect these species, including education

---

[12] Evidence was presented that, considering the number of existing registered boats in Camden County and two neighboring Florida counties, the permitted project could increase the number of boats in the area by about 2 percent, assuming the fully constructed project, capable of handling 800 boats, was filled to capacity and all the boats belong to new boaters.

of boaters about the risks of collisions, designation of low speed zones to reduce collisions, law enforcement of speed zones and other laws designed to reduce collisions, self-enforcement of laws by boaters, and adequate signs and warnings to inform boaters of risks and laws. The ALJ found that, on remand, the Committee must further address these conservation measures. The ALJ heard evidence of conservation measures which included the above measures and testimony presented by the Challengers that the appropriate measures would be to not build the permitted project or add any boats to the area. Nothing in the CMPA required the ALJ to adopt the conservation measures preferred by the Challengers. Since there was evidence to support the ALJ's decision, we find no error and affirm under the "any evidence" rule.

(d) The Challengers contend that the ALJ erred by failing to find that all private docks built from residential areas in the Cumberland Harbor development must be eliminated to satisfy the requirements of the CMPA for issuance of a permit for the project. The docks referred to by the Challengers are private docks built, or authorized to be built, across the marshlands by owners of residential lots with frontage abutting the marshlands. These docks are not regulated by the CMPA to the extent they comply with the provisions of OCGA § 12-5-295 (7). The Challengers concede that these docks do not require a permit under the CMPA, but they contend the docks are regulated under the CMPA because they are part of the project for which Point Peter applied for a permit under the CMPA. We rejected this argument in Division 2, supra. Neither the residential lots nor the private docks built from the lots are part of the permitted project.

The record shows that, when Point Peter applied for a permit to construct the marina and community dock project under the CMPA, it still had control, as the developer, over the residential lots from which private docks could be built adjacent to the proposed project. When the Committee considered the permit application under the CMPA, it properly considered what impact the proposed project would have in combination with the impact of private docks proposed to be built from the adjacent residential lots. The Committee had no power under the CMPA to directly regulate the private docks. But the Committee did act within its authority under the CMPA to require, as a condition of issuing the permit for the project, that Point Peter agree to restrict the number and size of the private docks which could be built. There was evidence to support the conclusion by the ALJ that these restrictions were sufficient to satisfy CMPA requirements for issuance of the permit. We find no error, and the ALJ's decision on this issue is affirmed under the "any evidence" rule.

(e) We find no merit to the Challengers' contention that the public was denied notice and hearing opportunities under the CMPA with

respect to the permit application and issuance of the permit because certain conditions of the permit were based on a draft version of the BA. There is no evidence of lack of compliance with public notice or hearing requirements set forth in OCGA § 12-5-286 (d), (e) or (f).

(f) Contrary to the Challengers' contention, the ALJ did not err by failing to find that "performance measures" in the BA were unlawfully vague and ambiguous. Construction of the marinas was permitted to occur in phases as dock spaces and demand for additional spaces is demonstrated. One of the conditions of the permit required that the project be monitored during construction to apply performance measures in the BA for conservation of marine life and wildlife before construction could proceed on the next phase. The performance measures supplement other conservation measures set forth in the BA. The Challengers complain that the description of a performance measure was not specific as to the species of wildlife or the level of conservation it was designed to maintain. There was no necessity for the permit to be conditioned on monitoring of specific performance measures during construction of the project.

Accordingly, the decision of the Fulton County Superior Court affirming by operation of law the decision of the ALJ is: (1) reversed to the extent the decision reversed the permit and remanded for the Committee to regulate features of Point Peter's upland residential development; (2) affirmed to the extent the decision reversed the permit and remanded for the Committee to further consider whether or not granting the permit and completing the proposed project would unreasonably interfere with the conservation of right whales, manatees, and sea turtles; and (3) affirmed to the extent the decision otherwise affirmed the permit. The cases are remanded to the superior court with directions that the court remand the cases to the ALJ for action on the permit in accordance with this opinion.

*Judgments affirmed in part and reversed in part, and cases remanded in Case Nos. A07A0752, A07A0753, A07A0897 and A07A0934. Ellington, J., concurs. Adams, J., concurs and concurs specially.*

ADAMS, Judge, concurring specially.

Although I concur in full with the majority opinion, the result in these cases raises concerns regarding the efficacy of the Coastal Marshlands Protection Act, OCGA § 12-5-280 et seq. We have concluded the Coastland Marshlands Protection Committee has no authority to address the effect that upland development will have on the marshland, even where, as here, the upland development and the marshland development are interconnected. Although other federal and state laws exist to address problems with wastewater and runoff, the existing patchwork of regulations may not successfully preserve this delicate and irreplaceable ecosystem. I write separately to urge

the legislature to consider whether broadening the scope of the CMPA to address such issues would better serve the marshland the CMPA is designed to protect.

DECIDED JULY 11, 2007 — ■■■■■■■

*Thurbert E. Baker, Attorney General, Isaac Byrd, Deputy Attorney General, John E. Hennelly, Senior Assistant Attorney General, James D. Coots, Assistant Attorney General, James A. Chamberlin, Jr.*, for Coastal Marshlands Protection Committee.

*Smith & Floyd, Charles C. Smith, Jr., Smith, Gambrell & Russell, Stephen E. O'Day, Alston & Bird, Beverlee E. Silva, Christopher K. DeScherer, Mary Maclean Doolan Asbill*, for Center for a Sustainable Coast et al.

*King & Spalding, Patricia T. Barmeyer*, for Point Peter, LLLP.

*McKenna, Long & Aldridge, R. Todd Silliman, Karsman, Brooks & Callaway, Dana F. Braun, Hunter, Maclean, Exley & Dunn, Frank J. Perch, Andrew H. Ernst, Julie V. Mayfield*, amici curiae.