A09A0387. LONGLEAF ENERGY ASSOCIATES, LLC
v. FRIENDS OF THE CHATTAHOOCHEE, INC. et al.
A09A0388. COUCH v. FRIENDS OF THE CHATTAHOOCHEE, INC. et al.

(681 SE2d 203)

ANDREWS, Presiding Judge.

These appeals are from a Fulton County superior court judgment invalidating an air quality permit issued by the Environmental Protection Division (EPD) of the Georgia Department of Natural Resources to Longleaf Energy Associates, LLC, for the construction

of a pulverized coal-fired electric power plant in Early County.[1] The Court upheld challenges to the permit brought by Friends of the Chattahoochee, Inc. and the Sierra Club (the Challengers), and ruled that the permit violated the Georgia Air Quality Act (GAQA) (OCGA § 12-9-1 et seq.) and the federal Clean Air Act (CAA) (42 USC § 7401 et seq.) on various grounds. The court also ruled that other errors occurred on administrative review. The most consequential ruling was the superior court's conclusion that the permit was invalid because it failed to include a limit on the power plant's carbon dioxide gas ($CO_2$) emissions. Because neither the CAA nor the GAQA contain regulations controlling $CO_2$ emissions, we reverse this ruling and hold that the permit was not required to include a $CO_2$ emission limitation. For the reasons that follow, we reverse the superior court judgment on this and other grounds, affirm in part, and remand the case with directions.

1. We begin with an overview of the statutes and regulations at issue and the procedural history of the case.

The CAA sets forth a regulatory scheme designed to protect and enhance the nation's air quality through joint federal and state participation. *Sierra Club v. Ga. Power Co.*, 443 F3d 1346, 1348 (11th Cir. 2006). Pursuant to the CAA, the federal Environmental Protection Agency (EPA) sets national ambient air quality standards (NAAQS) for regulated pollutants, and each state submits for EPA approval a State Implementation Plan (SIP) designed to ensure that the state's air quality achieves compliance with the federal standards. 42 USC §§ 7408 (a); 7409 (a); 7410 (a). To be approved by the EPA, a SIP must "include enforceable emission limitations and other control measures, means, or techniques . . . as may be necessary or appropriate to meet the applicable requirements of [the CAA]." 42 USC § 7410 (a) (2) (A); 40 CFR § 52.02 (a). Georgia's EPA-approved SIP is administered by the Georgia EPD pursuant to provisions in the GAQA and the Georgia Rules and Regulations for Air Quality Control (Ga. Comp. R. & Regs. r. 391-3-1-.01 et seq.) adopted under the authority of the GAQA. 40 CFR §§ 52.570; 52.572. We collectively refer to these Georgia statutes, rules, and regulations as the Georgia SIP. The Georgia SIP implements CAA requirements that, prior to construction of a new major facility with the potential to emit certain defined levels of regulated air pollutants in an area where air quality is in attainment of the NAAQS, the facility must obtain an air quality permit under the prevention of significant deterioration

---

[1] The separate appeals brought by Longleaf and by the EPD in the name of its Director, Carol Couch, are consolidated for this opinion.

(PSD) program. OCGA §§ 12-9-5 (b); 12-9-6 (b); Ga. Comp. R. & Regs. r. 391-3-1-.02 (1) (c), (7); 42 USC § 7470 et seq.; 40 CFR § 52.21. The PSD program is part of the CAA's new source review (NSR) program and is designed to prevent new pollution sources from degrading air quality in areas where the air meets the NAAQS. To accomplish this, the PSD program requires that the new facility be constructed using the "best available control technology" (BACT) for each regulated pollutant which the facility has the potential to emit in significant amounts. 42 USC §§ 7475 (a) (4); 7479 (3); 40 CFR § 52.21 (j) (2); Ga. Comp. R. & Regs. r. 391-3-1-.02 (7) (b) 7. It is undisputed that the proposed Longleaf power plant is a facility subject to the PSD program implemented in the Georgia SIP.

Under the approved Georgia SIP, the EPD is responsible for reviewing PSD permit applications and issuing permits. *Sierra Club*, 443 F3d at 1349; *Sierra Club v. Johnson*, 541 F3d 1257, 1260-1261 (11th Cir. 2008). On November 22, 2004, Longleaf applied to the EPD for a preconstruction permit for its power plant under the PSD permit program. The EPD considered the application over a period of 30 months, made various revisions to the conditions of the proposed permit, gave public notice, and responded to public comments. On May 14, 2007, the EPD issued an air quality permit to Longleaf under the PSD program. Pursuant to OCGA §§ 12-9-15 and 12-2-2 (c) (2), the Challengers then pursued state administrative and judicial review of the EPD-issued permit. 42 USC § 7661a (b) (6). The Challengers filed a petition challenging issuance of the permit on numerous grounds and invoking the right to a hearing before an administrative law judge (ALJ) of the Office of State Administrative Hearings (OCGA § 50-13-40 et seq.) in accordance with the Georgia Administrative Procedure Act (OCGA § 50-13-1 et seq.). The ALJ conducted a review of the permit and the challenges, culminating in a 21-day evidentiary hearing. During the review process, the ALJ dismissed some of the Challengers' grounds; rendered summary determination in favor of the EPD and Longleaf on other grounds; and denied the Challengers' motions seeking to amend the petition to raise a new issue during the hearing. On January 11, 2008, the ALJ entered a 108-page final decision affirming issuance of the permit. Pursuant to OCGA §§ 12-9-15 and 50-13-19, the Challengers filed in the Fulton County superior court a petition for judicial review of the ALJ's final decision and the pre-decision orders. In its final judgment entered on June 30, 2008, the superior court ruled on various grounds that the ALJ erred in affirming the EPD's issuance of the permit. We granted applications filed by the EPD and Longleaf for discretionary appeals from the superior court's final judgment. OCGA §§ 5-6-35 (a) (1); 50-13-20. In addressing claimed errors of

YALE LAW LIBRARY

law in the superior court's ruling, we conduct a de novo review. *Gen. Motors Acceptance Corp. v. Jackson*, 247 Ga. App. 141 (542 SE2d 538) (2000); *Gladowski v. Dept. of Family &c. Svcs.*, 281 Ga. App. 299 (635 SE2d 886) (2006).

2. The EPD and Longleaf contend that the superior court erred by ruling that the EPD was required to include a $CO_2$ emission limitation in the PSD permit.

As set forth above, the PSD permit portion of the NSR program requires use of BACT for regulated pollutants. It is undisputed that the CAA requires use of BACT "for each regulated NSR pollutant that [the facility] would have the potential to emit in significant amounts," and that a "regulated NSR pollutant" is defined to include any pollutant that "otherwise is subject to regulation under the [CAA]." Ga. Comp. R. & Regs. r. 391-3-1-.02 (7) (a) 2 (incorporating 40 CFR § 52.21 (b) (50) (iv) by reference); Ga. Comp. R. & Regs. r. 391-3-1-.02 (7) (b) 7 (incorporating 40 CFR § 52.21 (j) (2) by reference). The superior court ruled that $CO_2$ was a "regulated NSR pollutant" because it was "subject to regulation under the CAA," and that the PSD permit was invalid because it did not require a BACT emission limit to control the power plant's $CO_2$ emissions. To reach this conclusion the superior court reasoned that the recent decision in *Massachusetts v. Environmental Protection Agency*, 549 U. S. 497 (127 SC 1438, 167 LE2d 248) (2007), which found that $CO_2$ qualifies as an air pollutant under the CAA, established that $CO_2$ is a pollutant "subject to regulation under the CAA" for purposes of the PSD permit. The court also found that regulations monitoring or reporting $CO_2$, but not controlling or limiting $CO_2$ emissions under the CAA, establish that $CO_2$ is a pollutant "subject to regulation under the CAA" for purposes of the PSD permit. The court then ruled that, because $CO_2$ was "subject to regulation under the CAA," $CO_2$ was by definition a "regulated NSR pollutant" for which an emission limitation was required pursuant to BACT to obtain a PSD permit. It followed, the court concluded, that the Georgia SIP (which incorporates the applicable CAA provisions) required the EPD to control the power plant's $CO_2$ emissions using BACT.

This ruling was not required by the CAA or the decision in *Massachusetts v. EPA*, and would impose a regulatory burden on Georgia never imposed elsewhere. It would compel the EPD to limit $CO_2$ emissions in air quality permits, even though no CAA provision or Georgia statute or regulation actually controls or limits $CO_2$ emissions, and even though (to this Court's knowledge) no federal or state court has ever previously ordered controls or limits on $CO_2$ emissions pursuant to the CAA. It would preempt ongoing Congressional and EPA efforts to formulate a $CO_2$ emissions policy for all the

states,[2] and require the EPD to invent in a vacuum $CO_2$ emission controls for permits. If accepted, it would engulf a wide range of potential $CO_2$ emitters in Georgia — and Georgia alone — in a flood of litigation over permits, and impose far-reaching economic hardship on the State.[3] We reverse this ruling.

The United States Supreme Court decision in *Massachusetts v. EPA* does not mandate the superior court's ruling. In *Massachusetts v. EPA*, the Supreme Court held that $CO_2$ and other "greenhouse gases"[4] qualify as "air pollutants" under section 302 (g) of the CAA; that the EPA therefore has authority to regulate emissions of these pollutants from new motor vehicles under section 202 (a) (1) of the CAA, and that the CAA requires the EPA to exercise this regulatory authority if the EPA Administrator makes the predicate finding that emissions of these pollutants cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare. 549 U. S. at 528-535. After the superior court ruled in the present case, the EPA Administrator responded to the decision in *Massachusetts v. EPA* by issuing "Proposed Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202 (a) of the Clean Air Act." 74 Fed. Reg. 18886 (April 24, 2009). In this document, the EPA proposed to find: (1) that $CO_2$ (and other greenhouse gases) emitted from new motor vehicles do cause or contribute to air pollution, and (2) that these emissions may reasonably be anticipated to endanger public health and welfare. Id. To date, the EPA has not issued any final findings. The proposed findings did not include any proposed regulations addressing $CO_2$ emissions from motor vehicles. Instead, the EPA noted that it was

---

[2] In July 2008, the EPA published an advanced notice of proposed rule making, entitled "Regulating Greenhouse Gas Emissions Under the Clean Air Act," which explored numerous options related to $CO_2$ regulation. 73 Fed. Reg. 44354 (July 30, 2008). Congress is also considering legislation to address this issue.

[3] If $CO_2$ is regulated as an air pollutant under the CAA, a PSD permit and use of BACT to control $CO_2$ emissions would be required for any "major source" of air pollution with the potential to emit 250 tons of $CO_2$ per year. 40 CFR § 52.21 (b); Ga. Comp. R. & Regs. r. 391-3-1-.02 (7) (a) 2 (incorporating 40 CFR § 52.21 (b) by reference). For perspective on the scope of this regulation, the U. S. Chamber of Commerce estimates that the 250-ton per year $CO_2$ emissions threshold is met by over one million mid-sized to large commercial buildings including those in food service, health care, and lodging; over 200,000 manufacturing operations including chemicals, metal fabrication, food processing, minerals, plastics, paper, and electrical equipment; and over 20,000 large farms, including greenhouses and nurseries, poultry and egg production, vegetable and melon farms, and pig and dairy farms. A Regulatory Burden: The Compliance Dimension of Regulating $CO_2$ as a Pollutant, pp. 3-5, http://www.uschamber.com/publications/reports/0809_co2report.htm (September 2008).

[4] When greenhouse gases, including $CO_2$, are emitted, they mix and accumulate in the atmosphere and effectively trap some of the Earth's heat that would otherwise escape into space. 73 Fed. Reg. 44354, 44396-44401 (July 30, 2008).

not required to issue proposed standards to regulate $CO_2$ emissions along with the proposed findings, and that it was "developing proposed standards under section 202 (a)." Id. at 18888-18889. Accordingly, the EPA has not exercised authority pursuant to *Massachusetts v. EPA* to regulate $CO_2$ emissions. Even assuming the proposed EPA findings become final, and the CAA then requires the EPA to issue regulations controlling $CO_2$ emissions from motor vehicles under section 202 (a), no such regulation can occur until EPA-proposed standards are developed, finalized, and issued. As the EPA noted in its proposed findings under section 202 (a) of the CAA, even if the findings are finalized,

> a final positive . . . finding would not make the air pollutant [including $CO_2$] found to cause or contribute to air pollution that endangers [public health] a regulated pollutant under the CAA's Prevention of Significant Deterioration (PSD) [Permit] [P]rogram. See memorandum entitled "EPA's Interpretation of Regulations that Determine Pollutants Covered By Federal Prevention of Significant Deterioration (PSD) Permit Program" (Dec. 18, 2008).

74 Fed. Reg. 18886, 18905, n. 29 (April 24, 2009). The referenced EPA memorandum establishes the EPA's definitive interpretation of pollutants covered by the PSD program, and finds that a "regulated NSR pollutant" to which the BACT requirement applies in the PSD program "exclude[s] pollutants for which EPA regulations only require monitoring or reporting but include[s] all pollutants subject to a provision in the [CAA] or regulation adopted by EPA under the [CAA] that requires actual control of emissions of that pollutant." 73 Fed. Reg. 80300 (Dec. 31, 2008); EPA, Memorandum Interpreting PSD Regulations, pp. 6, 14, http://www.epa.gov/nsr/guidance.html (Dec. 18, 2008). Although the EPA is currently in the process of reconsidering the memorandum, it remains the EPA's interpretation. 74 Fed. Reg. at 18905, n. 29. The EPA denied the Sierra Club's request, made during the pendency of this appeal, to stay the effectiveness of the memorandum pending reconsideration. EPA, Letter to Sierra Club Granting Reconsideration, http://www.epa.gov/nsr/guidance.html (Feb. 17, 2009).

Under the EPA's interpretation, because there is no CAA regulation actually controlling or limiting $CO_2$ emissions, $CO_2$ does not fall within the "otherwise subject to regulation under the [CAA]" definition of a "regulated NSR pollutant." The EPA therefore concludes that a PSD permit issued under the NSR program does not require use of BACT to control $CO_2$ emissions. This was also

the EPD's interpretation of the Georgia SIP that was affirmed by the ALJ on summary determination. We find this interpretation to be correct and consistent with the applicable regulatory language. Under 40 CFR § 52.21 (b) (50) (as incorporated by reference into the Georgia SIP), a "regulated NSR pollutant" is defined in four categories. The first three categories refer to pollutants in three principal CAA program areas, followed by a fourth more generally defined category referring to any pollutant that "otherwise is subject to regulation under the [CAA]." The pollutants referred to in the first three categories are all subject to regulation that actually controls or limits their emissions. 40 CFR § 52.21 (b) (50) (i), (ii), (iii); EPA, Memorandum Interpreting PSD Regulations, pp. 6-7, http://www.epa.gov/nsr/guidance.html (Dec. 18, 2008). It is undisputed that $CO_2$ does not fall within any of the first three categories. Under the rule of statutory construction known as "ejusdem generis," when a generally described activity such as "otherwise is subject to regulation" follows an enumeration of specifically described activities, "the general activity will ordinarily be construed as referring to the same kind or class of activity as the preceding specific activities, unless something shows that a wider sense was intended." (Citations omitted.) *Coastal Marshlands Protection Committee v. Center for a Sustainable Coast*, 286 Ga. App. 518, 527 (649 SE2d 619) (2007). Applying this rule, we find that any pollutant that "otherwise is subject to regulation" in the fourth category refers to pollutants which, like those described in the three preceding categories, are subject to regulation by actual controls or limits on their emissions. Nothing shows that a wider sense was intended, and the rule is applicable to resolve an ambiguity in the term "regulation" as used in the phrase "subject to regulation." By definition, "regulation" may be understood to mean a pollutant subject to a procedural monitoring or reporting rule — a pollutant "subject to [a] regulation" — or may be understood to mean a pollutant subject to actual emissions control — a pollutant "subject to regulation." *In re Deseret Power Elec. Cooperative*, 2008 EPA App. LEXIS 47 at *53-*59 (EAB Nov. 13, 2008); EPA, Memorandum Interpreting PSD Regulations, pp. 6-9, http://www.epa.gov/nsr/guidance.html (Dec. 18, 2008). The "ejusdem generis" rule of construction resolves the ambiguity in favor of the latter understanding. Id.

Because no provisions of the CAA or the Georgia SIP control or limit $CO_2$ emissions, $CO_2$ is not a pollutant that "otherwise is subject to regulation under the [CAA]." Thus $CO_2$ is not a "regulated NSR pollutant" in the PSD program and was not required to be controlled by use of BACT. The superior court erred by ruling that the PSD

permit was required to include a BACT emission limit to control the power plant's $CO_2$ emissions.

3. The superior court also erred by ruling that the EPD was required to consider as part of its BACT analysis whether the proposed power plant should be required to use Integrated Gasification Combined Cycle (IGCC) technology to minimize pollution.

The BACT analysis which the EPD was required to conduct for the PSD permit is defined as:

> [A]n emissions limitation (including a visible emission standard) based on the maximum degree of reduction for each pollutant subject to regulation under [the CAA] which would be emitted from any proposed major stationary source or major modification which the Administrator, on a case-by-case basis, taking into account energy, environmental, and economic impacts and other costs, determines is achievable for such source or modification through application of production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques for control of such pollutant.

40 CFR § 52.21 (b) (12); Ga. Comp. R. & Regs. r. 391-3-1-.02 (7) (a) 2 (incorporating 40 CFR § 52.21 (b) by reference). It follows that BACT is a source-specific analysis that required the EPD to consider the benefit of reduced emissions that would result from applying available alternative control technology to the proposed pulverized coal-fired power plant in the form of "production processes or available methods, systems, and techniques, including fuel cleaning or treatment or innovative fuel combustion techniques."[5] The BACT analysis did not, however, require the EPD to consider any alternative control technology that, if applied to the proposed power plant, would constitute a redesign of the plant. *Sierra Club v. U. S. Environmental Protection Agency*, 499 F3d 653, 654-655 (7th Cir. 2007); *Blue Skies Alliance v. Texas Comm. on Environmental Quality*, 2009 Tex. App. LEXIS 2534 at *20-*27 (April 14, 2009). "Historically, EPA has not considered the BACT requirement as a means to redefine the design of the source when considering available control alternatives." EPA, New Source

---

[5] As a result of the BACT analysis, the EPD considered and required the application of various pollution control technologies in the proposed power plant, including innovative fuel combustion techniques (low nitrogen oxide burners and over-fire air) and pollution control systems such as selective catalytic reduction, fabric filter baghouses, and a dry scrubber.

Review Workshop Manual: Prevention of Significant Deterioration and Nonattainment Area Permitting, p. B.13, http://www.epa.gov/nsr/ttnnsr01/techinfo.html (Draft Oct. 1990).

The proposed pulverized coal-fired electric power plant is designed to burn crushed or pulverized coal in a boiler to produce steam to power a conventional turbine to generate electricity. An IGCC electric power plant uses a chemical process to convert coal into a synthetic gas (syngas), and then burns the syngas to power a combustion turbine to generate electricity. The EPD did not consider IGCC technology in its BACT analysis because it found that, if applied, IGCC technology would redefine the design of the proposed pulverized coal-fired power plant. In granting summary determination on this issue in favor of the EPD and Longleaf, the ALJ also reached this conclusion and ruled that it was not necessary to consider this technology in the BACT analysis. The superior court reversed the ALJ and ruled as a matter of law that IGCC technology had to be considered in the BACT analysis. The court did not reconsider the evidence showing the degree to which IGCC technology would alter or redesign the proposed power plant. Rather, the court ruled as a matter of law that the CAA mandated this result because the proposed electric power plant was the same type of facility whether it was a pulverized coal-fired plant or a plant using IGCC technology. The court based this CAA interpretation on the statutory definition of "major emitting facility" under the PSD program, which includes "fossil-fuel fired steam electric plants" (42 USC § 7479 (1)), and on a regulation pertaining to the "Standards of Performance for Electric Utility Steam Generating Units for which Construction is Commenced After September 18, 1978," that defined an "IGCC electric utility steam generating unit" as "a coal-fired electric utility steam generating unit that burns a synthetic gas derived from coal in a combined-cycle gas turbine." 40 CFR § 60.41 Da (2008). According to the court, these provisions showed that the CAA defined both types of plants as "fossil-fuel (coal) fired steam electric plants," and therefore the CAA mandated consideration of IGCC technology in the BACT analysis for the proposed pulverized coal-fired plant.

We reject this interpretation of the CAA, which ignores court and administrative decisions (and the EPA's traditional position) affirming that no BACT analysis is needed to consider control technology that, if applied, would redefine the design of the proposed facility. *Blue Skies Alliance*, 2009 Tex. App. LEXIS 2534 at *20-*27 (IGCC technology need not be considered as BACT because it would constitute a redesign of the proposed pulverized coal-fired electric power plant); *In the Matter of an Air Pollution Control Const. Permit*

*Issued to Wisconsin Elec. Power Co. &c.*, 2005 Wisc. ENV LEXIS 6 at *53 (Wis. Div. Hrgs. & App. Feb. 3, 2005) (IGCC technology not considered in BACT analysis because it would redesign pulverized coal-fired electric plant); see *Sierra Club*, 499 F3d at 654-655; EPA, New Source Review Workshop Manual, supra. Moreover, the definition of "IGCC electric utility steam generating unit" in 40 CFR § 60.41 Da (2008), relied upon by the superior court to support its ruling, has since been revised "to clarify the applicability and implementation of the subpart Da provisions to integrated coal gasification combined cycle electric utility power plants." 74 Fed. Reg. 5072, 5073, 5079 (Jan. 28, 2009). The clarified definition now defines an "IGCC electric utility steam generating unit" as "an electric utility combined cycle gas turbine that is designed to burn fuels containing 50 percent (by heat input) or more solid-derived fuel not meeting the definition of natural gas. No solid fuel is directly burned in the unit during operation." 40 CFR § 60.41 Da (2009). This eliminated the relied-upon portion of the regulation, which referred to an "IGCC electric utility steam generating unit" as "a coal-fired electric utility steam generating unit."

Consistent with the EPA's traditional view of BACT analysis, the EPD and the ALJ "distinguish[ed] between 'control technology' as a means of reducing emissions from [the proposed] power plant . . . and redesigning the [plant] — changing its 'fundamental scope.' " *Sierra Club*, 499 F3d at 655. This distinction is also consistent with the CAA provision, separate from BACT analysis, which provides for review of fundamentally different designs as "alternatives" to the proposed project. 42 USC § 7475 (a) (2); *Sierra Club*, 499 F3d at 654-655. The superior court erred by ruling as a matter of law that the CAA required consideration of IGCC technology in the BACT analysis.

4. To obtain a PSD permit, Longleaf was required to show by use of air quality modeling that emissions from the proposed power plant would not cause or contribute to air pollution in excess of the NAAQS adopted for regulated pollutants. 42 USC § 7475 (a) (3); Ga. Comp. R. & Regs. r. 391-3-1-.02 (7) (b) 8 (incorporating 40 CFR § 52.21 (k) by reference). The EPA has established NAAQS for particulate matter (PM), extremely small airborne particles, referred to as $PM_{2.5}$ for particles having a diameter of 2.5 micrometers or less, and $PM_{10}$ for particles having a diameter of ten micrometers or less. EPA, Office of Air and Radiation, Particulate Matter, http://www.epa.gov/air/particle pollution (accessed July 6, 2009).[6] The EPD and Longleaf contend that

---

[6] The EPA is currently reconsidering NAAQS for $PM_{2.5}$ pursuant to direction from the U. S. Court of Appeals for the D. C. Circuit. *American Farm Bureau Federation &c. v. Environmental Protection Agency*, 559 F3d 512, 519-531 (D.C. Cir. 2009).

the superior court erred by rejecting the use of $PM_{10}$ modeling as a surrogate for $PM_{2.5}$ modeling to demonstrate that the power plant's emissions would not cause or contribute to a violation of the NAAQS for $PM_{2.5}$. Ga. Comp. R. & Regs. r. 391-3-1-.02 (7) (b) 9 (incorporating 40 CFR § 52.21 (l) by reference).

When the EPA first adopted a NAAQS for $PM_{2.5}$ in 1997, it recognized that it was not yet technically possible to produce reliable air quality modeling for $PM_{2.5}$ for facilities seeking a PSD permit under the NSR program. To address this problem, the EPA issued a guidance memorandum, which advised PSD applicants and State permitting authorities that, because of technical problems with $PM_{2.5}$ modeling, the results of $PM_{10}$ air quality modeling should be used as a surrogate to satisfy PSD permit requirements for $PM_{2.5}$ modeling, until the EPA could develop reliable $PM_{2.5}$ modeling. EPA, Interim Implementation of New Source Review Requirements for $PM_{2.5}$, http://www.epa.gov/region07/programs/artd/air/nsr/nsrindexbydate. htm (Oct. 23, 1997). In April 2005, the EPA issued another guidance memorandum, which advised PSD permit applicants and State permitting authorities that, because EPA had still not resolved technical difficulties with $PM_{2.5}$ modeling, "administration of a $PM_{2.5}$ PSD program remains impractical" and that "States should continue to follow the October 23, 1997, guidance for PSD requirements" which advised the "use of $PM_{10}$ as a surrogate for $PM_{2.5}$ in meeting [PSD] provisions." EPA, Implementation of New Source Review Requirements in $PM_{2.5}$ Nonattainment Areas, p. 4, http://www.epa.gov/ region07/programs/artd/air/nsr/nsrindexbydate.htm (April 5, 2005). In April 2007, the EPA issued an implementation rule for $PM_{2.5}$, but it did not include requirements for PSD permits under the NSR program. Rather, the EPA specifically noted that "this rule does not include final $PM_{2.5}$ requirements for the new source review (NSR) program; the final NSR rule will be issued at a later date." 72 Fed. Reg. 20586 (April 25, 2007).

It follows that, when Longleaf submitted its PSD permit application to the EPD in November 2004, and when the EPD issued the permit in May 2007, there were no EPA-issued rules under the CAA and no corresponding rules in the Georgia SIP that required implementation of $PM_{2.5}$ modeling to obtain a PSD permit. The EPA confirmed this fact in comments it made to the EPD on the draft permit, which were incorporated into the final PSD permit. The EPA commented that: "$PM_{2.5}$ is a regulated NSR pollutant and should be acknowledged as such in the final determination. At your discretion, you could state that you are following EPA's guidance to use $PM_{10}$ as a surrogate for $PM_{2.5}$ until final $PM_{2.5}$ NSR implementation rules are adopted." The EPD responded: "EPD is following EPA's guidance to use $PM_{10}$ as a surrogate for $PM_{2.5}$ until final $PM_{2.5}$ NSR

implementation rules are adopted."

Consistent with this guidance, EPA regulation provides in 40 CFR § 52.21 (l) for use of the guideline for air quality models specified in Appendix W of 40 CFR Part 51. The Georgia SIP adopted these guidelines by reference. Ga. Comp. R. & Regs. r. 391-3-1-.02 (7) (b) 9. The Appendix W guideline for $PM_{2.5}$ modeling provides for consultation with the EPA to determine the most suitable model "on a case-by-case basis." 40 CFR Part 51, Appendix W, 5.2.2.1 (c). Thus, when Longleaf and the EPD used $PM_{10}$ air quality modeling as a surrogate for $PM_{2.5}$ modeling, they followed EPA guidance and the Georgia SIP and applied the only legal standard that existed in Georgia for $PM_{2.5}$ modeling. The ALJ correctly ruled as a matter of law on summary determination that the results of $PM_{10}$ modeling satisfied PSD permit requirements for $PM_{2.5}$ modeling. The superior court ignored the legal standard and erred by reversing the ALJ and ruling as a matter of law that use of $PM_{10}$ modeling as a surrogate for $PM_{2.5}$ modeling was not sufficient to satisfy PSD permitting requirements.[7] The EPD was not required, as the superior court suggests, to adopt specific $PM_{2.5}$ modeling which the Challengers advanced as an alternative to the modeling standard in the Georgia SIP. There being no evidence that the Georgia SIP standard applied by the EPD and the ALJ was arbitrary or capricious, deference was owed to the final agency determination. *Ga. Oilmen's Assn. v. Ga. Dept. of Revenue*, 261 Ga. App. 393, 398-399 (582 SE2d 549) (2003).

5. The superior court erred by reversing the ALJ's order dismissing two counts of the Challengers' petition on the basis that the counts failed to comply with pleading rules set forth in the Procedures For Disposition Of Contested Cases (Ga. Comp. R. & Regs., Chapter 391-1-2 et seq.) under the Administrative Procedure Act (APA).

The Challengers' petition for a hearing before the ALJ was governed by procedural rules in Ga. Comp. R. & Regs., Chapter 391-1-2 et seq. adopted by the Board of Natural Resources for use in contested cases under the APA. OCGA §§ 12-2-2 (c) (2) (A); 12-2-24

---

[7] The superior court also ignored additional guidance provided by the EPA before the Court entered its June 30, 2008 order. In May 2008, the EPA published a rule which made final several NSR program requirements as part of a framework for implementing PSD permitting for $PM_{2.5}$ NAAQS. 73 Fed. Reg. 28321 (May 16, 2008). As to PSD permitting in Georgia and other states with EPA-approved SIPs, the rule advised that they had up to three years to submit revised SIPs incorporating the new rule, and that in the interim they are authorized to continue using $PM_{10}$ modeling as a surrogate for $PM_{2.5}$ modeling. Id. at 28341. To date, Georgia has not revised its SIP on this issue. Although the EPA is currently reconsidering these aspects of the rule, it has taken no final action to date. EPA, Letter from Administrator Jackson to Earthjustice on $PM_{2.5}$ NSR Permitting Rule, http://www.epa.gov/nsr/actions.html (April 24, 2009); 74 Fed. Reg. 26098 (June 1, 2009).

(a); 50-13-3 (a) (2); 50-13-13 (a); 50-13-22. The pleading requirements in rule 391-1-2-.05 provide in relevant part:

> (1) A petition for hearing on the grant or denial of a permit or license shall contain . . .
> (g) In cases contesting the issuance of a license or permit, those suggested permit conditions or limitations which the petitioner believes required to implement the provisions of the law under which the permit or license was issued.

The ALJ considered the application of subsection (g) to two counts of the Challengers' seventeen-count amended petition. The amended petition was filed in response to the EPD's request for an order requiring the petition to comply with the pleading rules in subsection (g), and the ALJ's order that the Challengers amend the original petition to comply with subsection (g)'s requirement that the petition contain the "suggested permit conditions or limitations" which the Challengers believed were "required to implement the provisions of the law under which the permit . . . was issued."

In response, the Challengers alleged in one amended count that, as a result of inadequate assessment of health risks from "multi-pathway pollutants," the EPD issued the permit "without imposing emission limitations to impose an adequate margin of safety from these pollutants." Another amended count alleged that, because the EPD relied on inadequate air visibility modeling, the permit should be remanded for better modeling "at an emission level that will not impair visibility . . . and use that emission level as the emission limitation for [sulfur dioxide] and particulate matter if it is more stringent than the proper BACT emission limitation for those pollutants." These counts contested emission limitations, or the lack thereof, in the permit. At a hearing before the ALJ to consider the amended counts, the Challengers stated that the emission limitations they claimed were required to make the permit legal could be calculated and specified, but they contended it would be too costly for them to do so. In effect, the Challengers alleged that they did not know what emission limitations would make the permit valid, but they believed the ones adopted pursuant to the EPD permitting process were not sufficient, and that the EPD and Longleaf must conduct more assessments or modeling to discover the required emission limitations. The ALJ ruled that the amended counts did not comply with subsection (g) because, instead of containing suggested emission limitations that, if placed in the permit, would make the permit lawful, they alleged actions that Longleaf and EPD must take to establish yet unknown emission limitations which the Challengers believed should have been included in the permit.

We agree that the amended counts failed to comply with subsection (g)'s pleading requirement that the petition contain suggested emission limitations required to make the permit legal. This pleading requirement is not comparable to the liberal pleading requirements applicable when a civil action is commenced under the Civil Practice Act. Petitions challenging the issuance of a permit institute administrative review of agency proceedings which have already established a basis for the permit. In this case, lengthy and costly proceedings before the EPD resulted in a permit with specific conditions and limitations. The administrative review of the issuance of the permit was also constrained by the fact that discovery under the Civil Practice Act did not apply (*Fulton County Bd. of Assessors v. Saks Fifth Avenue*, 248 Ga. App. 836, 838-839 (547 SE2d 620) (2001)), and the imposition of a compressed time limit for the ALJ's decision where the petition was filed by third-party Challengers. OCGA § 12-2-2 (c) (2) (B) (decision required 90 days after petition is filed, plus 60-day extension allowed for good cause). In this context, subsection (g) reasonably required that a petition contesting the emission limitations under which the permit was issued must contain the suggested emission limitations needed to make the permit valid. The rule recognizes that administrative review was not designed to redo the permitting process, and that a claim must provide notice specific enough to enable a timely informed response from opposing parties and a prompt ruling by the ALJ. See *Nix v. Long Mountain Resources*, 262 Ga. 506, 508-509 (422 SE2d 195) (1992) (claims may be controlled or terminated pursuant to reasonable procedural rule rationally adapted to a particular type of review). We agree with the ALJ that, to promote these policies, subsection (g) plainly placed the burden on the Challengers to suggest the emission limitations which they believed would make the permit valid. This is consistent with the burden of proof placed on the Challengers during the administrative review, and recognized that the Challengers could not prevail on claims contesting issuance of the permit which alleged that the EPD and Longleaf had the burden to take action to prove that different emission limitations were required to make the permit valid. Ga. Comp. R. & Regs. r. 616-1-2-.07 (1) (b). Under these circumstances, we find no error in the ALJ's order dismissing the amended counts for failure to comply with the pleading requirements in Ga. Comp. R. & Regs. r. 391-1-2-.05 (1) (g).[8] See Ga. Comp. R. & Regs. r. 391-1-2-.04 (4).

---

[8] It was clear in the amended counts that the Challengers did not allege emission limitations in compliance with subsection (g), nor did they seek an extension of time to do so. Nevertheless, where the issue of compliance is not clearly addressed under subsection (g), the ALJ has discretion, as justice requires, to determine whether a petition can be reasonably

6. The EPD and Longleaf contend that the superior court erred by ruling that the permit was invalid because the EPD personnel who set the BACT emission limitations were not registered professional engineers.

The superior court made this ruling despite the fact that the ALJ refused on procedural grounds to allow the Challengers to raise this claim for the first time nine days after the hearing commenced. Contrary to the superior court's assertion in its order, the ALJ did not rule on the merits of this claim, but entered an order ruling that the Challengers could not belatedly raise the issue by amendment to their petition or by motion. The Administrative Rules of Procedure provide that, to amend the petition without the consent of the adverse party ten or less days prior to the date of the hearing may only be done "by leave of the ALJ for good cause shown." Ga. Comp. R. & Regs. r. 616-1-2-.08. Similarly, Ga. Comp. R. & Regs. r. 616-1-2-.16 (3) provides that "all motions shall be filed at least 10 days prior to the date set for hearing unless the need or opportunity for the motion could not reasonably have been foreseen" by that time. The ALJ found that there was no "good cause" to allow amendment of the petition, and that the motion attempting to raise the issue was untimely because the Challengers should have reasonably foreseen the need or opportunity for the motion before the filing deadline. The statement in the ALJ's order that, "even if" there had been good cause to amend the petition, the claim "would fail as a matter of law" was clearly dicta on which the ALJ made no ruling. The only ruling in the order was the ALJ's denial of the Challengers's motions seeking to untimely raise the claim nine days after the start of the hearing. The Challengers' petition to the superior court for judicial review concedes this point, stating that: "The ALJ denied Petitioners' motion [for leave to amend the petition] as untimely and issued a written order reflecting that decision."

The superior court ignored the ALJ's ruling that the Challengers could not belatedly raise the issue, and ruled on the substance of the issue as if it had been properly raised in the administrative review. The superior court had no jurisdiction to consider the substance of an issue which was not properly raised before the ALJ. OCGA § 50-13-19 (c); *Dept. of Human Resources v. Northeast Ga. Primary Care*, 228 Ga. App. 130, 132 (491 SE2d 201) (1997). Because the superior court lacked jurisdiction, it erred by ruling that the permit was invalid because the EPD personnel who set the BACT emission limitations were not registered professional engineers.

---

construed to comply, or can be amended to comply during a reasonable extension of time. Ga. Comp. R. & Regs. r. 391-1-2-.02 (3).

7. The EPD and Longleaf claim the superior court erred by ruling that the ALJ failed to apply a de novo standard of review with respect to the provisions of the PSD permit reviewed at the hearing and addressed in the ALJ's final decision rendered pursuant to the hearing.

After the EPD issued the permit, the Challengers exercised their right to have the EPD action reviewed in a hearing before an ALJ of the Office of State Administrative Hearings assigned under OCGA § 50-13-40 and acting in the place of the Board of Natural Resources.[9] OCGA §§ 12-2-2 (c) (2) (A), (B); 12-9-15 (a) (1) (referring to an ALJ appointed by the Board). The hearing was conducted pursuant to the provisions of the APA (OCGA § 50-13-1 et seq.) and the Administrative Rules of Procedure (Ga. Comp. R. & Regs., Chapter 616-1-2 et seq.) adopted pursuant thereto. At the hearing, the Challengers had the burden of proving their contentions by a preponderance of the evidence. Ga. Comp. R. & Regs. r. 616-1-2-.07 (1) (b); r. 616-1-2-.21 (4). The decision of the ALJ constituted the final decision of the Board. OCGA §§ 12-2-2 (c) (2) (D); 12-9-15 (a) (1). After the ALJ's decision was rendered affirming the EPD's issuance of the permit, the Challengers exercised their right to seek judicial review by the superior court. OCGA §§ 12-2-2 (c) (2) (D); 12-9-15 (a) (1); 50-13-19.

Under the procedural rules applicable to the hearing conducted by the ALJ, "the ALJ shall make an independent determination on the basis of the competent evidence presented at the hearing," and "[t]he hearing shall be de novo in nature and the evidence on the issues in any hearing is not limited to the evidence presented to or considered by the Referring Agency prior to its decision." Ga. Comp. R. & Regs. r. 616-1-2-.21 (1), (3). The independent determination and de novo hearing mandated by these rules required the ALJ to consider the applicable facts and law anew, without according deference or presumption of correctness to the EPD's decision, and to render an independent decision on whether the Challengers carried their burden to prove by the preponderance of the evidence that the permit should not have been issued. *Piedmont Healthcare v. Ga. Dept. of Human Resources*, 282 Ga. App. 302, 303-304 (638 SE2d 447) (2006); *Thornton-McKoy v. Couch*, 2008 Ga. ENV LEXIS 18 at *5-*7 (OSAH Sept. 9, 2008); see *Fulton County Bd. of Tax Assessors v. Nat. Biscuit Co.*, 2009 Ga. App. LEXIS 394 at *2-*3 (March 24, 2009). The record shows that the ALJ did not conduct a de novo review and render an independent determination, to the extent the ALJ improperly deferred to the EPD's decision.

---

[9] The Board is the policy making and governing body of the Georgia Department of Natural Resources. OCGA § 12-2-24. The EPD is a division within the Department of Natural Resources. OCGA § 12-2-2 (a).

The bulk of the ALJ's decision at the hearing concerned claims that emissions limitations on various regulated pollutants were not sufficient to satisfy BACT requirements. The ALJ commenced her application of the law to the facts on these issues by stating:

The BACT determinations that are the basis of the Permit limits necessarily require an exercise of discretion and judgment, which calls upon the agency's technical knowledge. Thus, even if this Tribunal concluded that reasonable persons could disagree as to what constitutes BACT for the Longleaf facility, the [EPD] Director's determinations should be affirmed if they are within the scope of her authority, constitute a reasonable exercise of her discretion, and satisfy the requirements of the law. This Tribunal should not substitute its equally reasonable determination for the [EPD] Director's reasonable determination.

At the conclusion of the decision, the ALJ again stated that "EPD's reasonable decisions should be afforded a measure of deference" and that "[s]o long as the [EPD] Director's decision was . . . within the reasonable bounds of her discretion, the permit should be upheld."

The deference clearly afforded by the ALJ to the EPD decision was inconsistent with the required de novo review and independent determination.[10] We find no merit to the EPD's claim that the ALJ was required to afford deference to its expert permitting decision. The cases cited by the EPD showing that deference is afforded to agency expertise are examples of the judicial standard of review applied by courts reviewing a final agency determination. See *Pruitt Corp. v. Ga. Dept. of Community Health*, 284 Ga. 158, 159-160 (664 SE2d 223) (2008). The ALJ's review in this case was not judicial review of an agency decision, but constituted the final decision of the agency's policy making and governing board. OCGA §§ 12-2-2 (c) (2) (D); 12-2-24; 12-9-15 (a) (1). Moreover, Article 2 of the APA, under which the Office of State Administrative Hearings was created "for impartial administration of administrative hearings" (OCGA § 50-13-40 (a)), does not contemplate ALJ deference to agency expertise. Rather, it provides:

When the character of the hearing requires utilization of a

---

[10] It would not have been inconsistent with the required standard of review for the ALJ to find that the EPD acted reasonably or provided persuasive reasons for its decision, and then reach an independent decision for the same reasons. What is required is that the ALJ's final decision be based on a de novo review and be rendered independent of and without deference to the EPD's decision.

hearing officer with special skill and technical expertise in the field, the chief state administrative law judge may so certify in writing and appoint as a special lay assistant administrative law judge a person who is not a member of the bar of this state or otherwise not qualified under this Code section. Such appointment shall specify in writing the reasons such special skill is required and the qualifications of the appointed individual.

OCGA § 50-13-40 (e) (4). The record does not reflect such an appointment in this case, but the availability of a special lay assistant with technical expertise in the field at issue is consistent with the ALJ's duty to conduct a de novo hearing and render an independent determination without deference to a technically complex agency decision.

We affirm the superior court to the extent it found that the ALJ erred by failing to apply the proper standard of review, and to the extent it found that the ALJ's final decision must be vacated. We remand the case to the superior court with directions that the ALJ's final decision be vacated,[11] and that the court remand the case to the ALJ to consider the evidence under the correct standard of review in accordance with this opinion.[12] *Greene v. Dept. of Community Health*, 293 Ga. App. 201, 204 (666 SE2d 590) (2008).

*Judgment affirmed in part and reversed in part, and case remanded. Miller, C. J., and Barnes, J., concur.*

DECIDED JULY 7, 2009 — 

*King & Spalding, Patricia T. Barmeyer, W. Ray Persons, Leslie A. Oakes, John C. Bottini*, for appellant (case no. A09A0387).

*Thurbert E. Baker, Attorney General, Isaac Byrd, Deputy Attorney General, Margaret K. Eckrote, Diane L. DeShazo, John E. Hennelly, Assistant Attorneys General*, for appellant (case no. A09A0388).

*Parks, Chesin & Walbert, David F. Walbert, Justine I. Thompson,*

---

[11] The ALJ entered separate orders granting summary determination on the issues addressed in Divisions 2, 3, and 4, supra; granting dismissal on the issue addressed in Division 5, supra, and denying motions on the issue addressed in Division 6, supra. Because those issues were not addressed by the ALJ in the final decision rendered pursuant to the hearing, they were not issues on which the ALJ applied an incorrect standard of review. Accordingly, the ALJ's separate orders on those issues are not vacated.

[12] The ALJ complied with the applicable standard of review to the extent that the evidence considered at the hearing was not limited to the evidence presented during the EPD permitting process. Accordingly, there is no necessity on remand for the ALJ to consider additional evidence or to conduct another hearing.

*Pamela M. Orenstein*, for appellees.

*Alston & Bird, Douglas E. Cloud, Jonathan E. Wells, Peter M. Degnan, Autry, Horton & Cole, Charles T. Autry, G. Mark Cole, Troutman Sanders, Margaret C. Campbell, John J. Dalton, Daniel S. Reinhardt, Norman L. Underwood, The Gordon Law Firm, Walter J. Gordon, Sr., Tisinger Vance, Richard G. Tisinger, Steven T. Minor, Jones Day, G. Graham Holden, Charles A. Perry, Balch & Bingham, Michael J. Bowers, Brinson, Askew, Berry, Seigler, Richardson & Davis, Robert M. Brinson, Norman S. Fletcher, McNatt, Greene & Peterson, Hugh B. McNatt, Sutherland, Asbill & Brennan, Herbert J. Short, Randall D. Quintrell, Bridges & Wright, Hal Wright, Schulten, Ward & Turner, Martin A. Shelton, Jennifer L. Pennington, Jonathan L. Schwartz*, amici curiae.